Sherman C. Hall and another, brought an action against Alfred Risley and another, and against Emil J. Heikkila seeking strict foreclosure of defendants' interest under a contract for the sale of realty. The defendant Heikkila answered seeking rescission of the contract.
The Circuit Court for Multnomah County, Charles W. Redding, J., rendered an adverse decree, and plaintiffs appealed.
The Supreme Court, Brand, J., held that a recorded contract between the city and a land owner providing for temporary relaxation of permanent building restrictions created no encumbrance, equitable servitude or burden on the land, as against a bona fide purchaser for value without actual notice. The Court also held that a second purchaser for value who had actual knowledge of the agreement took free of burdens.
Decree for plaintiffs in accordance with opinion, and case remanded with directions.
This is a suit by the plaintiffs, Sherman C. and Violet I. Hall, husband and wife, against the defendants, Alfred and Jessy Risley, husband and wife and the defendant Emil J. Heikkila, seeking strict foreclosure of the defendants' interest under a contract by which the plaintiffs agreed in writing to sell certain *Page 72 
real estate to the defendants Risley, and which contract the defendants Risley assigned to the defendant Heikkila. The defendants Risley failed to appear. The defendant Heikkila answered seeking rescission of the contract and a decree compelling the plaintiffs to pay to the defendant Heikkila the sum of $2,090 with interest. It is alleged by the defendant Heikkila and denied by the plaintiffs that there is an encumbrance on the property and that plaintiffs are unable to give good title. The suit was tried upon the merits and all relief sought, both by plaintiffs and by defendant Heikkila, was denied. The plaintiffs appeal. There is no appeal by defendant Heikkila.
The issues can be set forth without the usual summary of the allegations of the complaint, answer and reply.
On the second day of August, 1946, the plaintiffs and the defendants Risley entered into a written contract whereby plaintiffs agreed to sell to the defendants Risley the real property described in the complaint for the sum of $2,600, on account of which, $1,100 was paid on the execution of the contract. The following language was inserted by typewriter in the printed contract immediately after the description of the property: "Sold subject to Zoning and Building restrictions as may be of Record." The balance was to be paid in monthly installments of not less than $30 including interest until paid in full, the deferred payments to bear interest at six per cent payable monthly. Among other provisions of the contract it was agreed that if the purchasers should strictly and literally perform all and singular the agreements and stipulations of the contract, then "the first party shall give unto the second party, their heirs or assigns upon *Page 73 
request at Portland, Oregon and upon the surrender of this agreement, * * * Title Insurance Policy showing marketable title continued as to date of deed — Owner's Policy and a good and sufficient deed of conveyance, conveying said premises in fee simple, free and clear of incumbrances, excepting, however, the above mentioned taxes and assessments and all liens and incumbrances created by the second party or their assigns." Then follows the usual provision that, in the event of failure to perform upon the strict terms, time of payment and strict performance being declared to be of the essence, the seller should have the right to declare the agreement null and void or foreclose by strict foreclosure in equity, in either of which events the property should revest in the seller without any declaration of forfeiture or act of reentry, or without any other act by first party to be performed and without any right of the second party of reclamation or compensation for money paid. The contract provides for attorney's fees in the event of suit or action to foreclose the contract. Unless otherwise indicated, we shall refer to Heikkila, who alone appeared, as the defendant.
On the seventh day of November, 1946, the Risleys executed to the defendant a written assignment of all of their right, title and interest in the contract and in the real estate described therein in consideration of $2,000 to them paid, and they directed that upon full compliance of the terms of the contract by the assignee, conveyance be made to him. The contract shows a balance due to the plaintiffs on 7 October 1946 in the sum of $1,454.88. Since then three payments have been made as indicated by the notations on the contract, leaving a balance of $1,386.35 as of 6 January *Page 74 
1947. No payments have been made since that date. The plaintiff Sherman C. Hall testified that he has been ready, able and willing to make a warranty deed in accordance with the contract upon payment of the balance due but that there has been no offer of payment. It is by reason of the failure of the defendant to make the payments in accordance with the terms of the contract that the plaintiffs seek strict foreclosure thereof. It is the contention of the defendant that, on or about the first day of February, 1947, he discovered that the property was "encumbered" by reason of a certain agreement which had been entered into by the plaintiffs' predecessors in interest, which encumbrance was well known to the plaintiffs. It is for this reason that Heikkila has refused to pay upon the contract and seeks its rescission and the return of his money from the plaintiffs. Heikkila paid to the defendants Risley $2,000 and to the plaintiffs after the assignment $90. He seeks judgment for both sums from the plaintiffs. The question at issue is therefore whether there is any encumbrance and if so whether it is one which is excepted by the provision of the original contract which reads "Sold subject to Zoning and Building restrictions as may be of Record." The situation is unique.
The agreement, which, in the opinion of the defendant, has resulted in encumbering the property is one made between the City of Portland and Don and Edona Stansbery who were the predecessors in interest of the plaintiffs. The agreement relates to the use and occupancy of the premises. The answer pleads Ordinance 76947 of the City of Portland, known as the "War Code", which was approved on 26 March 1942 together with various amendments thereof and which ordinance is entitled "Relaxing In Certain Particulars *Page 75 
The Housing And Other Codes And Ordinances" of the City of Portland. Section 22-1301 of Article 13 of said ordinance provides that notwithstanding the provisions of the housing, building and other codes:
 "* * * and during the time mentioned in Section 22-1320 hereof the use or alteration of buildings and dwellings and the construction of new buildings designed to be used as apartments or housekeeping rooms or as single family dwellings may be in accordance with the regulations of the following sections, and the regulations of existing housing, building and other codes and ordinances if in conflict with the regulations of this Article shall not apply to property which shall have been brought under the provisions hereof. In other particulars the buildings brought under the provisions of this Article shall comply with the regulations of the housing, building and other codes and ordinances and nothing contained in this Article shall be deemed to allow any person to construct, maintain or repair any premises without obtaining permits for such work as provided in the appropriate codes."
Section 22-1320 which is referred to, supra, in Section 22-1301, provides:
 "The provisions of this Article shall be applicable only during the duration of the present national emergency and the owner or agent in charge of any premises coming under the regulations of this Article or desiring so to do shall first sign an agreement approved by the City Attorney as to form that within six (6) months after the termination of the present wars against the United States and a declaration of peace, the owner or agent in charge shall change the premises and its use to comply with the housing, building and/or other codes and ordinances applicable at that time to existing or new buildings or that he shall cause the building or other improvement to be demolished *Page 76 
or removed beyond the city limits and the permitted use to be discontinued, or if the use of the building previous to the changes allowed in this article was a legal use under the then existing codes, to remodel the building or other improvement so as to restore the same to its previous use and condition.
 "No permit for the use, construction, renovation, alteration or change of any building or other improvement under the terms of this Article shall be issued until the agreement above provided for shall have been executed, approved by the City Attorney as to form and filed with the Bureau of Buildings. Such agreement shall be deemed to attach to the premises irrespective of change of ownership and it shall be the duty of any person filing such an agreement, before selling or encumbering the property, to inform all parties acquiring an interest in the property of said agreement, and each owner or holder of an encumbrance shall in turn give like notice before selling or assigning his right, title or interest."
The defendant alleges and the plaintiffs admit paragraphs IV and V of the answer which are as follows:
"IV.
 "That by reason of the said ordinance, as amended, permits were issued for the construction, or conversion of certain buildings for temporary housing in the City of Portland, Oregon, for the war emergency period, and for six months thereafter upon application for such permit, without complying with the building code and regulation of the said City of Portland, Oregon, and stipulating that the said buildings were not to be used for residential purpose after six months following the cessation of hostilities.
"V.
 "That on the 14th day of January, 1944, the City of Portland, Oregon, issued to the predecessors in *Page 77 
interest a permit to convert the said structure to a dwelling unit for temporary occupancy for a period not to exceed six month [s] following the cessation of hostilities."
The quoted provisions of the War Code were in effect at the time of the execution of the agreement with the city by plaintiffs' predecessors in interest. The agreement which was signed by plaintiffs' predecessors in interest is as follows:
"AGREEMENT
 "KNOW ALL MEN BY THESE PRESENTS, that whereas the City of Portland, Oregon, by Ordinance No. 76947, as amended, has provided for relaxing upon certain terms, the provisions of the Housing Code and other codes and ordinances of said City during the present war emergency, and the undersigned Don Stansberry and Edona Stansberry, his wife, of Portland, Oregon, are applying to have a relaxing of said provisions made applicable to the building and premises owned by them at No. 6931 N.E. 15th Avenue, Portland, Oregon, particularly described as Lot 1, Block 6, Lowell, Addition, in the City of Portland, County of Multnomah, State of Oregon,
 "NOW, THEREFORE, the undersigned do hereby covenant and agree to and with said City, a municipal corporation, that in consideration of a relaxing, as provided by said Ordinance No. 76947, as amended, of said requirements, the owner or his successor in title to said property will, within six (6) months after the present wars against the United States are over and a declaration of peace has been made, change the building and/or its use to comply with the Housing, Building and other codes and ordinances applicable at that time to existing or new buildings, as the case may be, or that they will cause said building or other improvements to be demolished or removed beyond the city limits and the permitted use to be discontinued, or, *Page 78 
if the use of the building previous to the changes allowed in this article was a legal use under the then existing codes, to remodel the building or other improvement so as to restore the same to its previous use and condition. The provisions of this agreement shall be taken and applied as covenants running with the land and binding upon the undersigned heirs, devisees and successors in title until a formal release has been given.
 "And we, the undersigned, further covenant and agree to and with said city that we are the owners in our own right, of said property and have full authority to execute this document and that there is no mortgage or other lien or encumbrance against the property except None
 "The following is a memorandum of the change or changes above referred to: Alteration and use of shack building as single family residence under Art. 13 Ord. 76947 War Code.
 "IN WITNESS WHEREOF, We have hereunto set our hands and seals this 14 day of January, A.D. 1944.
 "/S/ Don Stansbery (Seal) "/S/ Edona Stansbery (Seal)
The instrument was acknowledged and is on file and of record in the office of the Bureau of Buildings.
Inspector Phillips testified that on 14 January 1944, the day on which the agreement was made between the city and the Stansberys, a permit was issued by the city for "an alteration of shack building as single family residence under Article 13 of Ordinance 76947 of the War Code." The inspector testified that the War Code "generally releases the requirements of the building division of the City of Portland as for use of buildings as family residences * * *". The plaintiff testified as follows:
 "A * * * when we sold it to Mr. Risley we found out and gave him all the dope on it. He *Page 79 
understood it all and everything and I had a man come out and he gave us a bid how much it would take to move the house and how much it would take take to perform (conform) to the city code."
Again the plaintiff, Sherman C. Hall, testified:
 "Q Referring to the contract, Plaintiffs' Exhibit 1, the statement which is as follows: `Sold subject to Zoning and Building restrictions as may be of Record' — who wrote that contract for you?
"A Mr. Walker.
 "Q Did you request him to mention the question of zoning etc in there?
 "A After we found out about that we took this man up there so he understood something was wrong so there wouldn't be no trouble. I wanted the thing thoroughly understood so there wouldn't be no trouble.
"MR. MASTERS: That was Risley?
"A Yes.
"Q (By Mr. Weinstein) Who took him up there?
"A I took him to Mr. Walker's office."
The foregoing testimony is undisputed and establishes the fact that the plaintiffs in their dealings with the Risleys fully complied with the provisions of the War Code, Section 22-1320, which require a vendor "to inform all parties acquiring an interest in the property of said agreement". The plaintiffs had no knowledge of the transaction between the Risleys and the defendant until after the assignment had been executed. There was therefore no opportunity afforded to the plaintiffs to give to the defendant Heikkila any information concerning either the building restrictions or the agreement.
No issue has been raised in this case concerning the validity of any of the provisions of the War Code *Page 80 
of the City of Portland. The "Housing And Other Codes And Ordinances", which are relaxed by the War Code, are not before us. However, it appears to be undisputed that the building in question did not qualify under the Housing And Other Codes And Ordinances for use as a single family dwelling. Counsel for the defendant stated to the trial court that the building was a war structure "and doesn't conform to the code". The plaintiffs acquired the property in July, 1945. The house was then on the property and had been for a good many years. At the time plaintiffs purchased the property they had no knowledge of the agreement with the City of Portland which had been executed by their predecessors in title, the Stansberys, but before the execution of the contract with the Risleys, the plaintiff, Violet I. Hall, was informed concerning the contract with the city and concerning the provisions of the zoning ordinances. Plaintiff Sherman C. Hall testified that he was informed that the house would have to be moved and that the inspector advised the plaintiffs that he would pass the property "if we put the proper foundation under it and moved it." Building inspector Christiansen testified, without objection, that the wall of the building in question was less than two feet from the property line and that under the code, when the structure was built, it should have been five feet from the property line. Apparently there are some other respects concerning the foundation in which the structure does not conform to the building codes if it is to be used as a family dwelling. Inspector Christiansen testified that the building is 20 x 24 feet in dimension; that it has the appearance of a garage that had been altered, and that as the building now exists, no permit could be issued from the building *Page 81 
department. We take it that his testimony related to the requirements of the permanent building code. We find no evidence concerning any expenditures made by the Stansberys, the plaintiffs, the Risleys or the defendant in converting the building into a single family dwelling. Assuming that the structure was once a garage, it is clear that at some time it must have been so converted and expenditures made in the process. But plaintiff, Sherman C. Hall, testified that the structure had been used as a dwelling "years and years before the war". Who converted it to dwelling uses and when, does not appear. Such use as a dwelling house must have been in violation of the permanent housing code. An analysis of the agreement and of the permit issued pursuant thereto shows that the permittee can use the property as a single family residence for the duration of the war plus six months, a use to which it could not be put but for the provisions of the War Code which relaxed the permanent ordinances of the city upon the conditions specified in the Code. Thus the agreement and the permit, to the extent we have indicated, granted privileges which did not otherwise exist. If there was any encumbrance against the property it must have been created by the ordinances of the city or by some promise which the permittee was required to make in order to gain the privilege of occupancy of the premises for residence purposes.
We will first consider whether the permanent housing and other codes and ordinances which restrict the use of buildings within the district, constitute encumbrances. The editors of A.L.R. in a comprehensive discussion of the question state the rule as follows:
 "While restrictions upon the use of land or the location and character of buildings that may be *Page 82 
erected thereon fixed by covenants or other private restrictive agreements constitute encumbrances rendering the title unmarketable, the courts, in the comparatively few cases considering the question, are in agreement upon the proposition that a restriction imposed by legislative or municipal authority, which is in existence at the time of the contract, is not generally to be considered such an encumbrance as may be availed of by the vendee to avoid his agreement to purchase; in other words, the public restrictions in effect at the time of the contract do not affect the rights and remedies otherwise existing between the vendor and vendee. * * *" 175 A.L.R. Anno., Land Contracts — Public Restrictions, § 2, p. 1056.
The text is supported by the following cases: Miller v.Milwaukee Odd Fellows Temple, 206 Wis. 547, 240 N.W. 193;Wheeler v. Sullivan, 90 Fla. 711, 106 S. 876; Kazwell v.Reynolds, 250 Ill. App. 174; Pembroke v. Peninsular TerminalCo., 108 Fla. 46, 146 S. 249. And see 4 Tiffany, Real Property, § 1005, p. 141.
In Anderson v. Steinway Sons, 165 N.Y.S. 608, affirmed221 N.Y. 639, 117 N.E. 575, the plaintiff contracted to sell real property to the defendant and brought suit for specific performance. The answer, which was admitted by demurrer, alleged that the purchaser was buying plaintiff's and other adjoining property for one purpose only, namely, to build a tenstory business building upon both, and that both parties were aware of the exclusive purpose of the purchaser. The answer alleged further that after the making of the contract an ordinance was passed prohibiting the erection of a business building on a portion of the property. The court refused to exercise its discretionary *Page 83 
power to compel specific performance by the purchaser, but the court said:
 "* * * Undoubtedly, if a person contracts to purchase a building, such as a tenement house or a factory, which is restricted as to the manner of its use by laws and ordinances existing when the contract is made, he will be chargeable with a knowledge of these restrictions, and will be deemed to have contracted to purchase the property subject to them. So, if defendant had contracted to buy the property in question here after the so-called zoning resolution had been adopted by the board of estimate and apportionment, and had become a part of the public law, it may well be that he could not be heard to object to taking title because of the restrictions imposed upon the use of the property by such resolution. * * *"
The case is distinguished in Biggs v. Steinway Sons, 229 N.Y. 320, 128 N.E. 211, and in Lincoln Trust Co. v. Williams Bldg.Corporation, 229 N.Y. 313, 128 N.E. 209. In the Lincoln Trust Co. case, the plaintiff vendor sued the vendee for specific performance of a land contract. The vendee defendant set up the provisions of municipal legislation regulating the height and bulk of buildings, area of yards, use of premises and the like, and contended that the ordinance constituted an encumbrance such that the vendor could not convey the property free from encumbrances. There was no evidence that the ordinance or "resolution" affected the value of the property contracted to be conveyed. The opinion of the Court of Appeals is in part as follows:
 "In a great metropolis like New York, in which the public health, welfare, convenience, and common good are to be considered, I am of the opinion that the resolution was not an incumbrance, since it was a proper exercise of the police power. The exercise of such power, within constitutional limitations, *Page 84 
depends largely upon the discretion and good judgment of the municipal authorities, with which the courts are reluctant to interfere. The conduct of an individual and the use of his property may be regulated. (Citing many cases.)
"* * *
 "The resolution in question simply regulates the use of property in the districts affected. It does not discriminate between owners. It is applicable to all alike. Therefore the general and well-nigh universal rule should be applied, viz., that where a person agrees to purchase real estate, which, at the time, is restricted by laws or ordinances, he will be deemed to have entered into the contract subject to the same. He cannot thereafter be heard to object to taking the title because of such restrictions. Bennett v. Buchan, 76 N.Y. 386.
 "The contract was deliberately entered into. It is not claimed that defendant was misled, deceived or improperly influenced in making it. The situation, so far as the resolution in question is concerned, was precisely the same when the deed was to be delivered as when the contract was executed. Defendant was not buying the property for a particular purpose. This case is clearly distinguishable from Anderson v. Steinway Sons, 178 App. Div. 507, 165 N.Y. 608, affirmed, 221 N.Y. 639, 117 N.E. 575. There, the land contracted to be purchased was for a specific use, known to both parties, and the contract was executed prior to the passage of the so-called zone resolution. Under such circumstances, the court held it would not, in the exercise of its discretion, decree specific performance. No such situation is here presented. It may be, as the Appellate Division found, that the defendant, at the time the contract was signed, did not have actual knowledge of the existence of the resolution. But this was something which it was presumed to have. The law always assumes that one contracts with intelligence and such assumption is not overcome, *Page 85 
unless proof be offered to the contrary, by an assertion of ignorance. Utermehle v. Norment, 197 U.S. 40, 25 Sup. Ct. 291, 49 L.Ed. 655, 3 Ann. Cas. 520. The court must enforce contracts as made. It looks to the instrument and usually is not concerned with the intelligence of the parties.
 "I am of the opinion that the resolution in question is a valid one; that it does not constitute an incumbrance upon the property which defendant agreed to purchase; and that it should be required to specifically perform the contract."
In Kend v. Crestwood Realty Co., 210 Wis. 239, 246 N.W. 211, the court stated the question for decision as follows:
 "* * * A vendor under a land contract agrees that the premises which he is to sell may be used for business purposes. He further agrees that a warranty deed will be issued upon the discharge of certain payments and conditions, conveying a title free and clear of incumbrances. A subsequent zoning law forbids the use of these premises for business purposes. It is contended by the plaintiffs that this has made it impossible for the defendant to convey an unincumbered title. We think there is no merit to this contention."
The suit was by the vendee for cancellation of the contract. The court said:
 "In Anderson v. Steinway Sons, 178 App. Div. 507, 165 N.Y.S. 608, the vendor sought specific performance. It appeared that a zoning ordinance, subsequent to the the contract but prior to the deed, had made the contemplated use of the property impossible, or at least illegal. The court, while recognizing that the title was marketable and unincumbered in a legal sense, held that under all the circumstances the relief of specific performance could not conscionably be given. This case amounts *Page 86 
merely to an application of the ordinary rule that when circumstances subsequent to a contract have so changed the situation as to render the equitable relief of specific performance unfair or unjust, the chancellor will follow his conscience and deny such relief. The application of such a doctrine to this case would not preclude the defendant assignee from an action at law for damages upon a refusal of the plaintiffs to proceed with the transaction. The contract was and is in full force and effect. There has been no breach or other conduct on the part of the defendants which would warrant rescission by plaintiffs. There is consequently no basis for an action to rescind; nor does the fact that a court of equity might decline its assistance in the direction of specific performance compel the conclusion that the same court should permit or assist plaintiffs to rescind."
 Anderson v. Steinway Sons, supra, is clearly distinguishable from the case at bar. The ordinance in the Anderson case was enacted subsequent to the contract and both parties contemplated a specific use of the property which became impossible by reason of the intervening ordinance. Furthermore it is clear that the intervening ordinance did not constitute an encumbrance but merely raised a question as to whether equity should exercise its discretionary power to grant relief. We conclude that restrictive ordinances which exist prior to the making of a contract of purchase and sale, do not constitute encumbrances.
Our next question is whether an encumbrance was created by the agreement of 14 January 1944 between the city and the Stansberys, the making of which was the consideration for the relaxing by the city of its permanent building ordinances and for the issuance of a permit for "Alteration * * * of shack building as *Page 87 
single family residence" under the War Code. Again we quote from the Annotation in A.L.R.:
 "* * * But, in accord with the view that existing zoning ordinances or other public restrictions upon the use of property do not in themselves render defective the title thereto, it is also held or recognized that where a private restriction does not exceed the limitations of a statute or other public regulation, it will not constitute an encumbrance where the possibility of repeal or abrogation of the public regulation is remote." 175 A.L.R., Anno. — Land Contracts — Public Restrictions, § 6, p. 1068. And see 55 Am. Jur., Vendor and Purchaser, § 250, p. 705.
The text is supported by the case of Bull v. Burton, 227 N.Y. 101, 124 N.E. 111. See also Batley v. Foerderer, 162 Pa. 460,29 A. 868; Floyd v. Clark, (1879) 7 Abb NC (NY) 136. Other cases in the note, 175 A.L.R. 1069 indicate that if a prior restriction substantially exceeds the restrictions imposed by ordinance or law, it will constitute an encumbrance. In our opinion the authorities support the following proposition:
 "* * * However, a restriction does not affect the marketable quality of the title where the vendee is not thereby required to do, or refrain from doing, anything which the law itself does not require * * *." 55 Am. Jur., Vendor and Purchaser, § 246, p. 703. See also 57 A.L.R. 1419.
In considering whether the Stansbery agreement constituted an encumbrance on the property, effect must be given to the general rule that although construction in favor of the unrestricted use of property must be reasonable:
 "Covenants and agreements restricting the free use of property are strictly construed against limitations *Page 88 
upon such use. Such restrictions will not be aided or extended by implication or enlarged by construction. Doubt will be resolved in favor of the unrestricted use of property." 14 Am. Jur., Covenants, Conditions and Restrictions, § 212, p. 621.
To the same effect see Scott Co. v. Roman Catholic Archbishop,83 Or. 97, 163 P. 88; Crawford et al. v. Senosky et al.,128 Or. 229, 274 P. 306.
It will be observed that the Stansbery agreement purports to require of the property owner the performance of some one of three obligations. The choice between the three being that of the owner. The owner would fully perform the contract if within six months after a declaration of peace in the "present war" he should "change the building and/or its use to comply with the Housing, Building and other codes and ordinances applicable at that time to existing or new buildings". There is no evidence or indication of any probable change in the Housing, Building or other codes in the immediate or foreseeable future. As we have said, the record leaves us without knowledge as to when any change in the physical structure in the building was made. It would appear then, under the "and/or" clause, that the contract would be performed by changing merely the use of the building. Thus, it would appear that the owner would comply with the contract if he merely ceased to use the property as a one-family dwelling, a use which he never could have enjoyed under the permanent ordinances but for the permit which he secured by signing the agreement.
The second means by which the owner could comply with the contract would involve the demolition or removal of the building, which so far as we know, would *Page 89 
impose a burden beyond any requirement of the permanent ordinances which are not before us.
The third provision of the contract specifying a means by which it could be performed states that "if the use of the building previous to the changes allowed * * * was a legal use under the then existing codes", then the owner is to remodel the building or other improvement so as to restore the same to its previous use and condition. Applying the rule of strict construction against limitations on the use of property, we construe this provision as meaning that the contract with the city will be performed by restoration to any previous legal use and condition. If the use previous to the changes allowed by the agreement was illegal, the inference is merely that such use would continue to be illegal. The property would be subject to all of the limitations as to use, whatever they may be, which are prescribed in the permanent ordinances of the city. We may summarize our view by stating that in our opinion the War Code and the agreement and permit, pursuant thereto, were intended merely to constitute a relaxation of the permanent provisions of the building codes. If no contract had been made with the city, a purchaser would have been chargeable with all of the restrictions imposed by the permanent codes. If we assume that he was bound by the contract, then he acquired and would continue to enjoy benefits otherwise denied him. Whether those benefits will be of long or short duration depends upon the termination of a war, the frigid temperature of which shows little prospect of amelioration.
The trial court held that the agreement with the city constituted an encumbrance. With some justification, it held that the matter had been so determined *Page 90 
in our recent case of Scobey v. Swartz, 176 Or. 654,160 P.2d 280, and it therefore gave no further consideration to the question. In the Scobey case the plaintiff agreed to sell and the defendant to buy certain property in the city of Portland. The defendant failed to make the prescribed payments and the plaintiff brought suit to rescind the contract. The defendant, by answer, alleged that the plaintiff knowingly made false and fraudulent representations to the effect that the building on the premises was a three-floor structure of seven apartments of two and three rooms each; that the floors could be lowered and the structure changed into one of four floors instead of three; that the plaintiff would undertake to make the changes if the defendant would increase the price commensurately and that the actual market value of the property was $4,000 whereas in truth the property had a value of no more than $1,000. Defendant alleged further that he believed the representations and in reliance thereon made expenditures. It is alleged that thereafter the defendant "discovered that the plaintiff and her husband * * * had encumbered the premises * * * by having entered into the following agreement with the City of Portland:" — then follows a copy of the contract signed by the plaintiff and her husband and by the city, under the War Code, which is similar to the one involved in the case at bar. The change, or changes, authorized by the contract, were described as "Alteration and use of rooming house as 7 single family, apartments, under Art. 13, Ordinance 76947, War Code." The plaintiff had been convicted for violation of the permanent ordinances and a fine suspended upon the condition that she would not operate the premises until she had complied with the regulations *Page 91 
of the city. Thereafter she made the contract with the city and then sold the property to the defendant who was in ignorance of the existence of the contract. The plaintiff failed to comply with the provision of the ordinance requiring her "to inform all parties acquiring an interest in the property of said agreement". The transcript of testimony in the Scobey case is not in the files of this court, but we have examined the abstract, briefs, opinion and decree of the trial court and the opinion of this court. From the opinion of the trial court we read:
 "At the time this problem was presented to the Court both of the parties seemed to be of the opinion that the equitable solution would be a rescission of the contract, under such terms and conditions as the Court might impose. The Court is in accord with this view."
Accordingly the decree rescinded the contract of purchase. The briefs filed in this court indicate that the case was tried by both parties on the theory that it was a suit for rescission on the ground of fraud. The issues which have been presented in the case at bar were not suggested to the court in the Scobey case nor were any authorities submitted tending to show whether such an agreement would constitute an encumbrance. When the Scobey case reached this court, certain issues were presented which have no relevancy to the case at bar. However, in the opinion by KELLY, J., we find it stated that the plaintiff sought rescission on account of the failure of the defendant to make the required payments and that the defendant urged that his failure to pay according to the terms of the contract "was caused by plaintiff's fraudulent concealment of the fact that on November 16, 1943, plaintiff had entered into an agreement with the city of Portland *Page 92 
* * *". The court observed that the validity of the agreement with the city had not been questioned. It held further that there was no showing that plaintiff could secure a policy of title insurance or transfer of the Multnomah County property to defendant, free and clear of encumbrance. It cited the rule that plaintiff is not entitled to rescind for default of a purchaser unless the plaintiff is able to perform in accordance with the terms of the contract, and continued:
 "Ability to perform on the part of plaintiff has neither been pleaded or proven.
 "Plaintiff's complaint reflects a cause of action for unpaid overdue installments upon the purchase price of the property in suit, and defendant is asserting a claim for damages. These are legal demands and should be heard by a trial court sitting as a court of law."
The case was remanded for trial as an action at law.
The following cases tend to explain the basis for the decision in the Scobey case. In any event, they point out a real distinction between that case and the one at bar. In Miller v.Milwaukee Odd Fellows Temple, supra, where it was held that zoning ordinances are not encumbrances, the court distinguishedRusch v. Wald, 202 Wis. 462, 232 N.W. 875, upon the ground that in the latter case it was "expressly represented to the intending purchaser, with design to deceive him, that the premises were not subject to the zoning ordinance." In Kazwell v. Reynolds, supra, the court pointed out that there was no suggestion of fraud or misrepresentation and the purchaser's suit to rescind was dismissed. In Millman v. Swan, 141 Va. 312, 127 S.E. 166, the vendee sought specific performance with an abatement in the purchase price because the vendor had innocently stated that the land was outside the *Page 93 
zoning ordinance, whereas in fact, unknown to both the vendor and vendee, the zoning ordinance had been extended to include the property. The vendor offered to rescind the contract. Specific performance was denied the vendee. It was held that the purchaser was bound to take notice of the ordinance and specific performance with abatement of price would not be awarded. The case was remanded, either for rescission as offered by the vendor, or for specific performance without abatement of price. In Gross v. William Penn Fire Insurance Co., 51 Pa. D C 296, the purchaser was permitted to recover his deposit because the vendor had innocently but falsely represented that the premises could be used as a tailor shop. Here again the elements of false representations were involved. We think the Scobey case, and those last cited from other jurisdictions, indicate that when false representations are made, especially if made with intent to defraud, questions are presented which are not involved here, and upon which we need express no opinion, for the facts differ materially from the situation in the case at bar. In the Scobey case fraudulent concealment by vendor was alleged by vendee. The vendor personally signed the agreement with the city and he personally failed to inform the vendee concerning the contract as required by the ordinance. The vendor in the pending case did none of these things. It is true that the opinion in the Scobey case implies that there was either an encumbrance, or at least, sufficient doubt as to marketability to warrant the refusal of equitable relief to the plaintiff. But, it is also true, as we have indicated, that the conditions under which the case was decided distinguish it from the case at bar. In the case at bar, the plaintiff testified that he was ready, able and willing *Page 94 
to perform his contract, and supported his testimony by authorities tending to show that the agreement with the city was not an encumbrance. Defendant calls attention to the fact that there is no allegation in the complaint that the plaintiffs are ready, able and willing to perform. This he now contends is fatal to the plaintiffs' case. In support, he relies upon Scobey v.Swartz, supra; Wells v. Page, 48 Or. 74, 80, 82 P. 856;Sievers v. Brown, 34 Or. 454, 56 P. 171; Higinbotham v.Frock, 48 Or. 129, 83 P. 536; Ward v. James, 84 Or. 375,164 P. 370, 164 P. 372. These cases go no further than the holding inHiginbotham v. Frock, supra, in which the court said:
 "* * * The rights of a vendee under a contract like the one under consideration cannot be forfeited by the vendor, although default has been made in the payments, unless he is in a position to perform his part of the agreement."
The only case cited by the defendant upon the issue of pleading is Frink v. Thomas, 20 Or. 265, where it is said:
 "* * * Where the vendor insists that the vendee is in default to such an extent as to entitle him to have the contract rescinded, he must allege and prove that he has tendered to the vendee a deed conveying to him all the land according to the terms of the agreement and demanded performance on the part of the vendee, and must have notified him that the contract would be rescinded unless purchase money was paid within a reasonable time. * * *"
Assuming that proper pleading requires an allegation that the plaintiffs are ready, able and willing to perform, we think that the defendant cannot take advantage of the absence of such allegation under the *Page 95 
circumstances of this case. The defendant has not appealed; there was no demurrer to the complaint, and there was no objection to the testimony of the plaintiff that he was ready, able and willing to make a warranty deed in accordance with the contract upon the payment of the balance due. The complaint at worst constitutes an imperfect statement of a good cause of suit and it is too late to raise the question now.
While there are authorities holding that a serious or reasonable doubt as to marketability may be sufficient to bar equitable relief when requested by a vendor, we think that such rule is not applicable when the issues giving rise to the doubt are the identical issues involved in the suit so that the decision of the suit will remove the doubt. It may be that plaintiffs would have difficulty in securing title insurance prior to the decision of this case, but so far as this record is concerned, all doubt as to marketability or insurability will be removed if the court holds that the agreement with the city did not constitute an encumbrance or did not bind the defendant.
The defendant is in an anomalous position. He is bound by, and charged with knowledge of, the provisions of the ordinances of the City of Portland, including both the War Code and the permanent building and zoning ordinances. He is therefore charged with knowledge that he cannot alter or use the property contrary to the provisions of the permanent ordinances unless his case comes within the relaxing provisions of the War Code, and that he cannot come within the relaxing provisions of the War Code unless the provisions of that code, which require a specific agreement with the city, have been complied with. How then can it be claimed that the agreement bound him beyond the *Page 96 
restrictions imposed by the ordinances. We conclude that the contract with the city did not bind any subsequent holders of the title beyond the restrictions imposed by the ordinances. However, since it may be contended that the obligations assumed by the Stansberys in the agreement amount to covenants running with the land, we will consider that matter.
The Stansbery agreement with the city contains the following: "The provisions of this agreement shall be taken and applied as covenants running with the land and binding upon the undersigned * * * and successors in title * * *". But the obligations of that contract cannot run with the land. In FirstNat. Bank v. Hazelwood Co., 85 Or. 403, 166 P. 955, this court held that only real covenants run with the land. We know of no authority which holds that an agreement concerning the use of land, made between the owner and a total stranger to the title, can run with the land. On the contrary:
 "* * * The essentials of such covenant have been stated to be that the grantor and grantee must have intended that the covenant run with the land; the covenant must affect or concern the land with which it runs; and there must be privity of estate between the party claiming the benefit and the party who rests under the burden. * * *" 21 C.J.S., Covenants, § 54, p. 923.
 "Ordinarily, a covenant may run with the land only when there is a subsisting privity of estate between the covenantor and covenantee, that is, when the land itself, or some estate or interest therein, even though less than the entire title, to which the covenant may attach as its vehicle of conveyance, is transferred; and, if there is no privity of estate between the contracting parties, the assignee will not be bound by, nor have the benefit of, any covenants between the contracting *Page 97 
parties, notwithstanding they relate to the land which he takes by purchase or assignment from one of the parties to the contract. The covenant of a stranger to the title is incapable of transmission by a mere conveyance of the land. Particularly is privity of estate essential in the case of covenants imposing burdens, although such privity may not be required in the case of covenants conferring benefits." 21 C.J.S., Covenants, § 58, p. 925.
In cases between grantor and grantee or lessor and lessee, where there is privity of estate, the intention of the parties may be a relevant circumstance in determining whether a covenant runs with the land. In First Nat. Bank v. Hazelwood Co., supra, the court quoted with approval from Masury v. Southworth,9 Ohio St. 340, 347, "a leading case":
 "* * * The nature and character of the covenant may be such that it may run with the land; and yet, if it be clearly the agreement of the parties that it shall not so run, it would not be annexed, in despite of the agreement so expressed. And, on the contrary, however clearly and strongly expressed may be the intent and agreement of the parties, that the covenant shall run with the land, yet, if it be of such a character that the law does not permit it to be attached, it cannot be attached by the agreement of the parties, and the assignee would take the estate clear of any such covenant." (To the same effect see 21 C.J.S., Covenants, § 61, p. 927.)
So far as we are concerned with the contention of the defendant that the agreement between the Stansberys and the city amounts to an encumbrance, the holding in Pearson v. Richards et al.,106 Or. 78, 211 P. 167, would appear to be in point.
 "Some authorities take the view that a general covenant against encumbrances is a real covenant *Page 98 
and therefore runs with the land, while in a majority of the jurisdictions, including Oregon, the courts hold that it is a personal covenant and therefore does not run with the land: 7 R.C.L. 1105, 1112, 1135, 1163; Sanford v. Wheelan, 12 Or. 301, 307
(7 P. 324)."
While it is clear that the written undertaking of the Stansberys in the agreement with the city, a stranger to the title, cannot be deemed a covenant running with the land, we would not be understood as holding that there cannot be equitable restrictions, and perhaps even burdens, imposed upon land, which may bind subsequent holders of the legal or equitable title, even though such restrictions or burdens do not run with the land; but we do hold that an equitable servitude or burden which does not run with the land and which was not imposed for the benefit of other land, will not bind subsequent bona fide purchasers for value without notice. The evidence discloses that the plaintiffs Hall bought the property without any notice or knowledge of the making of the Stansbery agreement with the city. It is true that the agreement was placed on file and of record in the office of the Acting Building Inspections Director, but we know of no provisions of law by which such filing or recording constitutes constructive notice of the terms of the agreement. They acquired knowledge of the agreement only shortly before they entered into the contract of sale with the Risleys. Since the agreement with the city was not made for the benefit of any other land, and did not run with the land, and since the plaintiffs were without constructive or actual knowledge, it would appear that the plaintiffs themselves *Page 99 
took the land free from any equitable servitude or burden.
 "Theories of restrictions; covenant as creating an equitable burden on the land. — This doctrine may be regarded as an equitable substitute for or addition to the legal rule concerning covenants running with the land; or it may be explained by regarding the covenant as creating an equitable easement. The latter theory has been adopted by many able American courts. In either view, the covenant confessedly creates an equitable burden of the land, which follows it into the hands of subsequent holders, with the single qualification that a subsequent owner who acquires the legal estate for value and without notice takes it free from this burden (see §§ 735, et seq.). * * *" 4 Pomeroy's Equity Jurisprudence, Fifth Edition, § 1295, p. 850.
If the plaintiffs Hall took the land free of any servitude or burden, we think that the vendees Risley also took free of the burden, even though they had actual knowledge of the agreement.
 "The second rule is, that if a second purchaser with notice acquires title from a first purchaser who was without notice and bona fide, he succeeds to all the rights of his immediate grantor. In fact, when land once comes, freed from equities, into the hands of a bona fide purchaser, he obtains a complete jus disponendi, with the exception last above mentioned, and may transfer a perfect title even to volunteers. * * *" 3 Pomeroy's Equity Jurisprudence, Fifth Edition, § 754a, p. 57. (The exception mentioned is irrelevant to the application of the rule in this case.)
Accordingly, Heikkila is in the position of one having neither notice nor knowledge, and no party to this litigation could enforce an equitable servitude or burden against him. Nor could the city, for the *Page 100 
agreement did not run with the land; was not made for the specific benefit of any land, and created at most an equitable servitude which could bind only persons chargeable with notice of it.
 "In general, restrictions on the use of property may be enforced by and against the parties thereto and those in privity with them. In equity one who is not a party may, nevertheless, enforce a restriction imposed for his benefit and, conversely, a restriction may be enforced against a grantee of the premises subject to such restriction who takes with notice thereof.
 "Conversely, a restrictive covenant may be enforced only against a party thereto or one in privity with him, except as it may be enforced in equity against a grantee with notice, as hereinafter shown. * * *
 "* * * Where restrictions are intended primarily to benefit the coventee in his particular use of the land, equity may treat the agreement merely as a personal covenant between the parties, and not as one creating an equity in the nature of a property right. In the absence of notice, a personal covenant imposing a burden will adhere exclusively to the covenantor, unless a privity of estate or tenure subsisted or was created between the covenantor and the covenantee at the time when the covenant was made; * * *
 "The right of a person not a party thereto to enforce in equity a restriction on the use of property depends on whether or not the restrictive covenant or agreement was imposed on the land owned by defendant for the benefit of the land owned by plaintiffs who are seeking to enforce the restriction; if so, equitable relief should be granted to the plaintiffs, if not plaintiff should be denied the equitable relief prayed. * * *
 "Restrictions limiting the use of land, if reasonable, may be enforced in courts of equity against *Page 101 
the land designated to be benefited or burdened in whosesoever hands it may be, without regard to whether the creation of the restriction is in the nature of an easement or of a covenant, provided the parties, both grantee and grantor, understood the nature and burden of the restriction and had notice thereof, either actual or constructive. Whether a restrictive covenant runs wtih the land is material in equity only on the question of notice; since, if it runs with the land, the covenant binds the owner regardless of knowledge, and if not, he is bound only if he took the land with notice. So, regardless of whether a covenant not to use the land for certain purposes runs with the land, a court of equity will, nevertheless, enforce it against a grantee taking title through a deed reciting the covenant and subject thereto, or against a grantee taking title with full knowledge of its existence, although it be omitted from his deed; but equity will not impose the burden of a restrictive covenant on one who purchases the land for value without actual or constructive notice of its restriction. * * *" 26 C.J.S., Deeds, § 167, p. 543.
See Stewart v. Alpert, 262 Mass. 34, 159 N.E. 503; Vogeler v.Alwyn Improvement Corporation, 247 N.Y. 131, 159 N.E. 886;Toothaker v. Pleasant, 315 Mo. 1239, 288 S.W. 38; Bresee v.Dunn, 178 Cal. 96, 172 P. 387.
So far as this record shows, there is no encumbrance, equitable servitude or burden on the land, and plaintiffs are in a position to give title insurance and a deed free of encumbrances. The plaintiffs have shown complete good faith. They purchased without knowledge of the Stansbery agreement, but having acquired knowledge thereof, they informed their purchasers, the Risleys, of the facts, whether required to do so or not. They were without knowledge of the transaction between the Risleys and the defendant. The *Page 102 
defendant's contention that conduct of the plaintiffs has permitted a gross fraud to be perpetrated on the defendant is wholly without merit. The plaintiffs are entitled to a decree of strict foreclosure, but in view of the complex issues which were presented herein, the case will be remanded to the circuit court. Upon a showing in that court that the plaintiffs are ready, able and willing to give a deed in accordance with the terms of the contract and to furnish title insurance in accordance therewith, the court is directed to issue an interlocutory decree requiring the defendant to comply with the terms of the contract and to pay to the plaintiffs the full balance due under the terms thereof, or in default of such payment, within six months from the date of the interlocutory decree, that the contract be strictly foreclosed and the defendant be barred from any claim or right in or to said real property and without any right of reclamation or compensation for money paid or for improvements made as provided in the contract.
The contract of purchase and sale provides that in case suit or action is instituted to foreclose the contract, the second party agrees to pay such sum as the court may adjudge reasonable as attorney's fees. The transcript shows that the respective parties stipulated that the court set the attorney's fees at a sum not greater than $150, for which plaintiffs pray in their complaint. Plaintiffs are entitled therefore to judgment in the sum of $150 as a reasonable attorney's fee.
Page, J. did not participate in this decision. *Page 103