[No. 38550. En Banc. March 9, 1967.]

SNOHOMISH COUNTY, *Appellant,* v. SEATTLE DISPOSAL COMPANY *et al., Respondents.*\*

\*Reported in 425 P.2d 22.

*Robert E. Schillberg* and *Henry Templeman,* for appellant.

*Julian C. Dewell* (of *Anderson & Hunter*) and *Chadwick, Chadwick & Mills,* for respondent Seattle Disposal Company.

*Lewis A. Bell* (of *Bell, Ingram & Smith*), for respondent Tulalip Tribes.

FINLEY, C. J.—The defendant Seattle Disposal Company leased land known as Allotments 91 and 92 from the intervenor, the Tulalip Tribes, for the purpose of operating what is called a sanitary land-fill garbage and refuse disposal site. The lease was authorized by ordinance No. 29 passed by the Tulalip Tribes, an Indian group organized as a federal corporation pursuant to the Indian Reorganization Act, 48 Stat. 988, 25 U.S.C. § 477.

Allotment 91 was purchased in 1960 in the name of the United States in trust for the Tulalip Tribes. The Tulalip Tribes purchased Allotment 92 at a Snohomish County Superior Court sale in November of 1963. Both parcels of land are located within the Tulalip Indian Reservation and within Snohomish County. Under Snohomish County Zoning Ordinance No. 7, as amended, a conditional use permit is required in order to carry on garbage disposal operations, except on lands exempt from county regulation. Neither

Seattle Disposal nor the Tulalip Tribes ever applied for a permit to allow garbage operations on Allotments 91 and 92, and such a permit was never issued.

The plaintiff, Snohomish County, brought suit against Seattle Disposal, seeking an injunction to prevent Seattle Disposal from disposing of, or preparing to dispose of, garbage within the county without first procuring a conditional use permit. The Tulalip Tribes moved for leave to intervene, and the trial court granted permission to do so. Both Seattle Disposal and the Tulalip Tribes moved for summary judgment on the basis that the court lacked jurisdiction over the subject matter of the action. The trial court granted summary judgment in accordance with the motions on the grounds, among others, that the state and its governmental agencies have no jurisdiction over the use of the land in question, that the zoning ordinance if applied to Allotments 91 and 92 would constitute an encumbrance in violation of 28 U.S.C. § 1360 and RCW 37.12.060, and that the Tulalip Tribes have the power to the exclusion of the county or state to regulate the use of the land in question and have done so by ordinance No. 29. The county has appealed.

The plaintiff county contends that the use of the lands in question is within the jurisdiction of the state of Washington. The county relies in part on the General Allotment Act, ch. 119, § 6, 24 Stat. 390 (1887), which provided that lands would be allotted to individual Indians, and that such lands would be held in trust by the United States for the allottees for 25 years, at the end of which the land would be patented in fee to the allottees. The General Allotment Act further provided that at *the issuance of the patent in fee* the allottees would become subject to the civil and criminal laws of the state or territory in which they resided. *Kirkwood v. Arenas,* 243 F.2d 863 (9th Cir. 1957). The record discloses that Allotments 91 and 92 were allotted to individual Indians by executive order pursuant to the Point Elliott Treaty of 1855, 12 Stat. 927, and the sixth article of the Treaty with the Omahas of 1854, 10 Stat. 1043,

and not by virtue of the General Allotment Act of 1887. We thus have no occasion to determine whether, in view of 34 Stat. 326 (1906) and 48 Stat. 984 (1934), 25 U.S.C. § 462, which extended existing periods of trust, any jurisdiction over Indians was ever relinquished by the federal government by virtue of the General Allotment Act of 1887.

The county's alternative position is that Public Law 280, 67 Stat. 589 (1953), as amended and codified in 28 U.S.C. § 1360, operated as an authorization for Washington to assume jurisdiction, and that Laws of 1957, ch. 240, as amended by Laws of 1963, ch. 36, now codified as RCW 37.12, acted as the consent of the people, in terms of article 26 of the Washington Constitution, to the assumption of civil and criminal jurisdiction over Indians and their lands within the state. This general proposition is clearly the law, and the Tulalip Tribe has voluntarily come within this grant of state jurisdiction. *State v. Paul*, 53 Wn.2d 789, 337 P.2d 33 (1959). The county further recognizes the limitation on this assumption of jurisdiction, which appears in RCW 37.12.060 as taken from 28 U.S.C. § 1360, which reads as follows:

> Chapter limited in application. *Nothing in this chapter shall authorize the alienation, encumbrance, or taxation of any real or personal property,* including water rights and tidelands, belonging to any Indian or any Indian tribe, band, or community *that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States*; or shall authorize regulation of the use of such property in a manner inconsistent with any federal treaty, agreement, or statute or with any regulation made pursuant thereto . . . . (Italics ours.)

There is no question but that Allotment 91, title to which was taken in the name of the United States in trust for the Tulalip Indians, comes within the limitation expressed in RCW 37.12.060. The county argues, however, that Allotment 92 does not come within the terms of this limitation. We disagree. Allotment 92 was *sold* free and clear of all trusts or restraints against alienation, pur-

suant to 70 Stat. 290, 25 U.S.C. § 403a—1, at the judicial sale in the partition action of Snohomish County Superior Court civil cause No. 76503. However, the purchase of Allotment 92 by the Tulalip Tribes reimposed the requirement, under 54 Stat. 1057, 25 U.S.C. § 403a and 70 Stat. 290, 25 U.S.C. § 403a—2, that any long term lease or sale of this land be made only with the consent of the Secretary of the Interior. The necessity of the Secretary's approval constitutes a restriction against alienation imposed by the United States. See *La Motte v. United States*, 254 U.S. 570 (1921). Thus the limitation stated in RCW 37.12.060 and 28 U.S.C. § 1360, applies, and the state is without authority to encumber or tax either Allotment 92 or 91.

The county argues that the application of zoning ordinance No. 7 to the land in question, particularly the mere requirement of application for a conditional use permit, does not constitute an "encumbrance" on the property. The requirement of a permit is part and parcel of the zoning ordinance, and if the ordinance cannot be applied to the land involved neither can the requirement of a permit.

■ This court has said in the past that any "burden upon land depreciative of its value, such as a lien, easement, or servitude, which, though adverse to the interest of the landowner, does not conflict with his conveyance of the land in fee" constitutes an encumbrance. *Hebb v. Severson,* 32 Wn.2d 159, 167, 201 P.2d 156 (1948). The application of the zoning ordinance to prohibit or limit the use of this land for commercial purposes certainly could be considered to diminish its value. We agree with the approach taken by the United States Supreme Court in *Squire v. Capoeman,* 351 U.S. 1 (1956). In that case the court concluded that the words "charge or encumbrance," as they appear in the General Allotment Act of 1887, should be interpreted broadly, and any doubt should be resolved in favor of the Indians for whose benefit that legislation, as well as the legislation before us, was intended. We, therefore, hold that Snohomish County Zoning Ordinance No. 7, if construed to apply to Allotments 91 and 92, constitutes an encumbrance within the meaning of 28 U.S.C. § 1360, and RCW 37.12.060.

■ We find support for this result in an opinion by the Acting Solicitor for the Department of the Interior which concludes that the state in the exercise of its police power may not interfere by zoning ordinance with land held by the United States in trust for Indians. 58 I.D. 52 (1942). See, also, an opinion of the Washington Attorney General, AGO 59-60, No. 59 (1959), in which the same conclusion is reached. We find nothing in Public Law 280 or in other applicable federal law to indicate an intention to the contrary. Thus, we conclude that, even apart from the inclusion of zoning ordinances within the word encumbrance, the federal government has not intended to allow states or their governmental agencies to interfere with the use of restricted Indian lands by means of zoning ordinances.

■ The county also argues that since Seattle Disposal is a non-Indian organization it should not be able to benefit from the special rights or privileges granted to Indians. The Tulalip Indians are clearly authorized, subject to the regulation of the Secretary of the Interior, to make commercial leases for substantially unlimited purposes. See 54 Stat. 1057, 25 U.S.C. § 403a; 60 Stat. 962, 25 U.S.C. § 403b; and 69 Stat. 539, 25 U.S.C. § 415. Limitation on the use to which a lessee from the Tulalip Tribes can put Indian lands is limiting the Indian use. The county cannot indirectly accomplish federally prohibited interference with property that it could not accomplish directly. See AGO 59-60, No. 59 (1959); *Jordan v. O'Brien*, 70 S.D. 393, 18 N.W.2d 30 (1945); *United States v. County of Allegheny*, 322 U.S. 174 (1944).

■ The county also contends that to hold that the zoning ordinance does not apply to the lands in question and to allow Indian self-regulation would deny to the members of the Tulalip Tribes and to residents of adjoining lands the equal protection of the laws. This novel argument would find a denial of equal protection in each of the myriad cases of juxtaposed but different regulation by different sovereigns in our system of federalism. We have already determined that this state has no jurisdiction to control either

directly or indirectly the use of the Indian lands in question. Where there is no jurisdiction, there can be no denial of equal protection.

We are aware of the Congressional intent to make Indians as nearly as possible full and equal citizens. We are also aware of the intent, clearly expressed in 60 Stat. 962, 25 U.S.C. § 403b, and 69 Stat. 539, 25 U.S.C. § 415, to promote Indian commercial activities. See, also, Kelly, *The Economic Basis of Indian Life*, 311 Annals 71 (May 1957). That our decision today promotes the latter policy rather than the former is not the result of a judgment as to competing values, but rather a determination as to what to us clearly seems to be the applicable law. The state has, of course, been granted jurisdiction to inspect and regulate health, sanitation, and related matters on Indian tribal lands. 45 Stat. 1185, 25 U.S.C. § 231. In the matter of the regulation of the use of restricted Indian lands, however, the United States has conferred on the Indians a degree of immunity from regulation by state and local government, and only the United States can remove this immunity. *Cf. Department of Game v. Puyallup Tribes, Inc.*, ante p. 245, 422 P.2d 754 (1966).

The judgment is affirmed.

HILL, DONWORTH, ROSELLINI, and HUNTER, JJ., and LANGENBACH, J. Pro Tem., concur.

HALE, J. (dissenting)—I dissent for three reasons: (1) Zoning laws, it seems to me, are not encumbrances on land but rather are an exercise of the police power to foster the public welfare, health and safety; (2) although Indian reservations may be partially immune from state regulations, this immunity ought not extend to activities which immediately and directly affect the citizenry at large; and (3) any immunity from the state's police regulations enjoyed by the Indians for activities on the reservation should not cover their non-Indian lessees or assigns. I believe, therefore, that neither Indians nor their lessees may operate a garbage

dump on the reservation in violation of the zoning laws of Snohomish County.

As the majority has said, Indians of the Tulalip reservation voluntarily acceded to state jurisdiction for enforcement of the criminal law, thus directly bringing the reservation as a matter of principle within the police power of the state. 28 U.S.C. § 1360; RCW 37.12; *State v. Paul*, 53 Wn.2d 789, 337 P.2d 33 (1959). The majority opinion, however, sidetracks the right of the state to achieve desirable state ends through a reasonable exercise of its police power and, in excluding the reservation from operation of the zoning regulations, largely ignores state police powers expressed through county regulations. It premises its holding mainly on the idea that the zoning laws of Snohomish County constitute an encumbrance on land under 28 U.S.C. § 1360(b), a statute which says that "Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property."

I recognize, of course, that the majority uses the term "encumbrance" in a general sense as indicating any substantial limitation of or condition upon the use of one's property and not as a word of art, denoting more specifically a covenant, easement, lien, or burden running with the land and attached to the title thereto. The broad general meaning employed by the majority, however, in my opinion, is not called for by the statute. The term "encumbrance" should be given its more definitive and precise meaning—one denoting a burden on the land and affecting the title thereto or one impairing the power of alienation such as a mortgage, lien, easement, lease, or other disability to fee ownership.

Although zoning laws do impair the uses to which one may put his land, from their inception they have not been deemed an encumbrance on real estate. In 1920, the Court of Appeals of New York in *Lincoln Trust Co. v. Williams Bldg. Corp.*, 229 N.Y. 313, 317, 128 N.E. 209 (1920), said of zoning restrictions:

In a great metropolis like New York, in which the public health, welfare, convenience and common good are to be considered, I am of the opinion that the resolution was not an incumbrance, since it was a proper exercise of the police power.

Virtually the same statement was made in *Miller v. Milwaukee Odd Fellows Temple*, 206 Wis. 547, 240 N.W. 193 (1932). Accord: *Hall v. Risley*, 188 Ore. 69, 213 P.2d 818 (1950); *Lohmeyer v. Bower*, 170 Kan. 442, 227 P.2d 102 (1951), the latter case holding expressly that municipal restrictions on the use of land existing at the time a sale of real estate is completed are not encumbrances on land so as to enable the vendee to avoid his contract to purchase on the ground the restrictions rendered his title unmerchantable. Were zoning regulations regarded as encumbrances on land in the legal sense, the courts at their inception would have held them to constitute a taking or damaging of real estate under the state's power of eminent domain and not simply an expression of the police power.

Although zoning laws, as with other manifestations of the police power, do impair to some degree the untrammelled enjoyment of land, they are, nevertheless, constitutionally sustainable on the universally accepted theory that they represent an expression of the state's police power. 101 C.J.S. *Zoning* § 7 (1958); 8 McQuillin, Municipal Corporations § 25.10 (1965).

Thus, they have been regarded judicially as similar to other laws affecting the use of real property, such as codes fixing standards for plumbing, electrical wiring and building, and drainage and sewerage regulations, along with rules governing the disposition and collection of refuse and garbage. All—even though they do in one way or another interfere with the use of property—are constitutionally acceptable as a legitimate means of fostering the general welfare and contributing to the public peace, health, safety and morals under the police power. The courts recognize that conditions of life, work, recreation and leisure are directly affected by the location of manufacturing and

processing plants, facilities for trade, commerce and finance, the location of parks, playgrounds and highways, freedom from air and water pollution, access to air and sunlight and open spaces and, of course, facilities for the disposition of refuse and garbage.

Hence, I am of the opinion that the right of the Tulalip Indians and their lessees to put a garbage dump on their reservation is not a right running with the land, but rather a privilege to be exercised under the police power in common with all other landowners in the county.

I presume that Indians born in the United States and residing in Washington are citizens of the United States and of the state of Washington. 8 U.S.C. § 1401. Therefore, they assume the same responsibilities as all other citizens, subject to no privileges and immunities not shared equally by all citizens. Thus, while their land within the reservation, because of its exceptional derivation of title, may be free from some of the restrictions which curtail other landowners, the special nature of that ownership does not make an Indian reservation a foreign country, inhabited as it is by citizens of the United States and the state of Washington. We must not lose sight of the fact that the Tulalips are Americans living in Snohomish County, Washington, United States of America.

I see a sensible distinction available in deciding whether the police power of the state extends to the Indian reservation in a particular case. If the action or omissions prohibited by the police power are of the kind which directly injure or endanger the surrounding area and its inhabitants or the state's citizenry at large, or reasonably appear to do so, then the Indians ought not be permitted to flout the state's laws enacted to preserve the public peace, health, safety and welfare from the very injuries and dangers which the police regulations were reasonably designed to prevent or curtail. That the Congress recognizes this principle may be inferred from its enactment of 25 U.S.C. § 231 mandating the Secretary of the Interior to allow the states

to enforce health, sanitation and educational laws on Indian reservations, as follows:

The Secretary of the Interior, under such rules and regulations as he may prescribe, shall permit the agents and employees of any State to enter upon Indian tribal lands, reservations, or allotments therein (1) for the purpose of making inspection of health and educational conditions and enforcing sanitation and quarantine regulations or (2) to enforce the penalties of State compulsory school attendance laws against Indian children, and parents, or other persons in loco parentis except that this subparagraph (2) shall not apply to Indians of any tribe in which a duly constituted governing body exists until such body has adopted a resolution consenting to such application.

Therefore, unless federal legislation directly prohibits the exercise of state jurisdiction, the state, I believe, may and should exercise its police power over Indian reservations as far as may be reasonably necessary to preserve the peace, safety and welfare of its citizens—including, of course, its Indian citizens. 27 Am. Jur. *Indians* § 48 (1940). A different rule would prevent the state, in the reasonable exercise of the police power, from enforcing on the reservation such laws as are designed to prevent contamination of the state's waters; control and reduce air pollution, quell riots and public disturbances likely to spread to adjoining areas; quarantine and treat epidemic diseases in imminent danger of spreading throughout the state; suppress loud and protracted noises emanating from the reservation to the disturbance of non-Indians living nearby; enforce compliance with electrical safety codes designed to protect all users of the electrical system; enforce fire control and safety regulations, which, if ignored, may set an entire district of the state ablaze; and capture dangerous criminals.

Therefore, if the state may exercise its sovereign powers to protect its people, including its citizens of Indian extraction, from these innumerable hazards and possesses a jurisdiction over Indian reservations not directly prohibited by federal legislation, it has the power to enforce on the reservation the laws reasonably designed to protect all of its

citizens, Indian or non-Indian alike, from such hazards and dangers originating on the reservation which directly threaten the peace, repose, welfare and safety of all citizens.

I include zoning regulations among these laws and, therefore, would hold that the Indians of the Tulalip reservation are without legal authority to convert a part of their reservation into a commercial garbage dump unless they proceed in pursuance of and according to the zoning regulations of Snohomish County.

As to the Seattle Disposal Company, I find little basis in Indian law for that company to operate a garbage dump on the reservation in violation of the county zoning laws any more than a lessee of mineral rights on Indian lands was immune from state taxes on gross production. *Oklahoma Tax Comm'n v. Texas Co.*, 336 U.S. 342, 93 L. Ed. 721, 69 Sup. Ct. 561 (1949). Similarly, the transaction of business on an Indian reservation by a non-Indian with non-Indians has been held not exempt from the state's business and occupation tax. Situs of the transaction on the reservation did not remove the non-Indian entrepreneurs from the state's taxing powers. *Neah Bay Fish Co. v. Krummel*, 3 Wn.2d 570, 101 P.2d 600 (1940). Accord: *Surplus Trading Co. v. Cook*, 281 U.S. 647, 74 L. Ed. 1091, 50 Sup. Ct. 455 (1930).

That the privileges and immunities of reservation Indians are not assignable or negotiable may be seen from the general rule asserted in Association on American Indian Affairs, Federal Indian Law 513 (1966), prepared by the Solicitor General for the Department of the Interior, where it is stated as a general rule that:

[T]he Indian country within a State ordinarily is not regarded as an area of exclusive Federal jurisdiction but is politically and governmentally a part of the State in which State laws apply to the extent that they do not conflict with Federal Indian law.

Federal Indian laws, being protective in nature, were enacted to govern the Indians only; they limit the operation

of state laws only where "Enactments of the Federal Government passed to protect and guard its Indian wards *only* affect the operation, within the colony [or reservation], of such state laws as conflict with the federal enactments." (Italics mine). Federal Indian Law, *supra*, at 513. I find no federal legislation guarding or protecting a commercial garbage dump as a business on the reservation, and, hence, I am unable to see how the Snohomish County zoning laws can be considered in conflict with federal enactments.

As far as I can determine from the record, the Seattle Disposal Company is a non-Indian entity purposing to engage in a non-Indian and nonfederal activity on a reservation. Being both non-Indian and nonfederal, the company does not, in my opinion, enjoy any of the immunities and privileges which may by federal law have been conferred upon its Indian wards.

I would, therefore, reverse.

WEAVER and HAMILTON, JJ., concur in the result of the dissent.

June 2, 1967. Petition for rehearing denied.