The **AGUA CALIENTE BAND OF MIS-SION INDIANS' TRIBAL COUN-CIL et al.,** Plaintiffs,

v.

The **CITY OF PALM SPRINGS,** etc., et al., Defendants.

**Vyola J. ORTNER,** on her own behalf, and as guardian for Benita Joyce Olinger and Debra Sue Olinger, Intervenors.

No. 71–767–JWC.

United States District Court, C. D. California.

May 17, 1972.

Edward M. Daley, Long Beach, Cal., for intervenors.

## MEMORANDUM OPINION

CURTIS, District Judge.

This is an action for declaratory relief, seeking the settlement of a long standing controversy between the Tribal Council of the Agua Caliente Band of Mission Indians and the municipal officers of the City of Palm Springs over whether the City's zoning laws are directly applicable to Indian Reservation lands, allotted and unallotted, even though they are held in trust by the United States. The City has maintained that since the adoption of Public Law 280 (Act of August 15, 1953, ch. 505; 67 Stat. 589, as amended; 18 U.S.C. § 1162; 28 U.S.C. § 1360), its zoning laws and all other ordinances apply to Indians and to Indian Trust lands located within the City, just as it applies to all other persons and lands so situated.

In 1965, the Tribal Council, being then concerned with this problem, brought suit in this court [1] to enjoin the application of the City's zoning laws to Indian Trust lands. After some negotiation, however, it was agreed, by way of compromise, that the Department of the Interior, under authority it presumed to possess, would adopt these zoning laws and make them applicable to Indian Trust lands. As a result, the action was dismissed by stipulation.

The plaintiffs, apparently no longer content with this arrangement, have commenced the instant suit for declaratory relief, asserting their desire to be free from the City's zoning control and their further desire to regulate the use of tribal and allotted Indian lands by means of their own tribal zoning ordinance.

Raymond C. Simpson, Long Beach, Cal., for plaintiffs.

Raymond E. Ott, City Atty., City of Palm Springs, Palm Springs, Cal., for defendants.

It is conceded that jurisdiction in this court is proper under Title 25 U.S.C. § 349, Title 28 U.S.C. § 1362, Title 28 U.S.C. § 1360, and Title 28 U.S.C. § 1331.

---

1. Agua Caliente Band of Mission Indians v. City of Palm Springs, No. 65–567–MC.

## PLAINTIFFS HAVE AUTHORITY TO BRING THIS ACTION

As a threshold question, the intervenors, who are members of the Tribe, but are not members of the council, assert that the tribal constitution and by-laws do not authorize the Tribal Council to bring or prosecute this action, nor do they authorize the Council to make regulations concerning the use of the allotted lands.

Poafpybitty v. Skelly Oil Co., 390 U.S. 365, 370–371, 88 S.Ct. 982, 19 L.Ed.2d 1238 (1968), holds that an Indian landowner has standing to maintain an action to protect his rights, notwithstanding the fact that the Government, as guardian, can also sue.

The intervenors argue, however, that the Tribal Council has no authority under the constitution and by-laws of the Tribe to include in this action, which relates to tribal property, other lands allocated to individual Indians. Article V(a) provides, in part, that the Tribal Council shall exercise the following powers:

> "[T]o protect and preserve the Tribal property . . . and the rights of its members; . . . and to protect the security and general welfare of the Band and its members."

The provisions of Article V(1) are somewhat enlightening in that it empowers the Tribal Council:

> "To negotiate with the Federal, State and local governments on behalf of the Band and obtain advice and opinions from representatives of any such governmental units on matters relating to the jurisdiction of the particular governmental unit involved and which concern the status of the Band and its property, such as matters of taxation, the application of State, civil and criminal laws, and annexation of tribal lands to the City of Palm Springs."

■ It appears that the prosecution of this action for declaratory relief comes clearly within the powers of the Tribal Council, as provided in its constitution and by-laws, and I so hold.

I shall not discuss, at this point, what powers, if any, the Tribal Council has to impose its own zoning regulations upon lands within its reservation, as this court's final conclusion will make it unnecessary to do so.

We come, then, to the principal issue raised: May the City of Palm Springs enforce its zoning laws upon Indian lands located within the city limits?

Plaintiffs' contentions can be grouped under three main headings.

1. Was Indian Trust land legally included within the City of Palm Springs upon its incorporation?

2. Does the application of the City's zoning ordinance to Indian Trust land constitute an unlawful interference with tribal sovereignty?

3. Is Public Law 280 unconstitutional?

## WAS THE INDIAN LAND IN QUESTION LEGALLY INCLUDED WITHIN THE CITY OF PALM SPRINGS UPON ITS INCORPORATION?

The plaintiffs contend that although the Indian land was located within the territory to which the Palm Springs incorporation purported to relate, the Indian land could not legally be included as a part of the city since there was no express federal consent.

■ There is little doubt that Congress could require such consent, but there appears to have been no such federally prescribed mandate at the time of incorporation. It is well established that so long as the law of the state in which the land lies permits the incorporation or annexation of federally owned land, no federal consent is necessary. In Surplus Trading Co. v. Cook, 281 U.S. 647, 650–651, 50 S.Ct. 455, 456, 74 L.Ed. 1091 (1930), the Supreme Court said:

> "It is not unusual for the United States to own within a state lands which are set apart and used for public purposes. Such ownership and use without more do not withdraw the lands from the jurisdiction of the

state. On the contrary, the lands remain part of her territory and within the operation of her laws, save that the latter cannot affect the title of the United States or embarrass it in using the lands or interfere with its right of disposal. ·

"A typical illustration is found in the usual Indian reservation set apart within a state as a place where the United States may care for its Indian wards and lead them into habits and ways of civilized life. Such reservations are part of the state within which they lie and her laws, civil and criminal, have the same force therein as elsewhere within her limits, save that they can have only restricted application to the Indian wards."

In Howard v. Commissioners of Louisville Sinking Fund, 344 U.S. 624, 626–627, 73 S.Ct. 465, 467, 97 L.Ed. 617 (1953), the Court held that a municipality could annex federally owned land which had become subject to the exclusive jurisdiction of the United States. There the Court said:

"When the United States, with the consent of Kentucky, acquired the property upon which the Ordnance Plant is located, the property did not cease to be a part of Kentucky. The geographical structure of Kentucky remained the same. In rearranging the structural divisions of the Commonwealth, in accordance with state law, the area became a part of the City of Louisville, just as it remained a part of the County of Jefferson and the Commonwealth of Kentucky. A state may conform its municipal structures to its own plan, so long as the state does not interfere with the exercise of jurisdiction within the federal area by the United States. Kentucky's consent to this acquisition gave the United States power to exercise exclusive jurisdiction within the area. A change of municipal boundaries did not interfere in the least with the jurisdiction of the United States within the area or with its use or disposition of the property. The fiction of a state within a state can have no validity to prevent the state from exercising its power over the federal area within its boundaries, so long as there is no interference with the jurisdiction asserted by the Federal Government. The sovereign rights in this dual relationship are not antagonistic. Accommodation and cooperation are their aim. It is friction, not fiction, to which we must give heed."

Thus both Surplus Trading Co. v. Cook, *supra*, and Howard v. Commissioners of Louisville Sinking Fund, *supra*, indicate that the federal ownership of the Indian land in question did not bar the inclusion of the land within the City of Palm Springs upon its incorporation in 1938. However, the plaintiffs rely heavily on the old case of Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832), for the proposition that Indian lands may not be encroached upon in any manner by state laws. The Court, there, was considering a series of legislative acts commencing in 1828 by which the Legislature of the State of Georgia sought to allocate Cherokee Indian land to certain counties within the State and to extend State laws to it. Chief Justice Marshall, speaking for the Supreme Court, held such legislation unconstitutional and interpreted congressional intent to be to:

"[C]onsider the several Indian nations as distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries which is not only acknowledged, but guarantied [sic] by the United States." 31 U.S. at 556.

But the Supreme Court has long since departed from this conceptual position. Surplus Trading Co. v. Cook, *supra*; Howard v. Commissioners of Louisville Sinking Fund, *supra*; Organized Village of Kake v. Egan, 369 U.S. 60, 72, 82 S.Ct. 562, 569, 7 L.Ed.2d 573 (1962).

In the case of Organized Village of Kake v. Egan, *supra*, the Supreme Court

explained the limitations on the *Worcester* case:

"The general notion drawn from Chief Justice Marshall's opinion in Worcester v. Georgia [citations omitted] that an Indian reservation is a distinct nation within whose boundaries state law cannot penetrate, has yielded to closer analysis when confronted, in the course of subsequent developments, with diverse concrete situations. By 1880 the Court no longer viewed reservations as distinct nations. On the contrary, it was said that a reservation was in many cases a part of the surrounding State or Territory, and subject to its jurisdiction except as forbidden by federal law . . . ."

Plaintiffs further rely upon *Your Food Stores, Inc. v. Espanola*, 68 N.M. 327, 361 P.2d 950 (1961). But the *Espanola* case involved the question of state taxation under the Buck Act; 4 U.S.C.A. §§ 105–110, which authorizes states to levy sales or use taxes within certain federal areas. The Buck Act does not apply to Indian reservations. *Warren Trading Post Co. v. Arizona Tax Commission*, 380 U.S. 685, 691 n. 18, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965).

■ In any event, whatever the law may be in the State of New Mexico, California permits the inclusion of federal lands within an incorporated city. Section 34302 of the Government Code of the State of California provides that any portion of a county may be included within a municipal corporation. In 1938 when Palm Springs was incorporated, that statute read as follows:

"Any portion of a county, if such portion contains not less than five hundred inhabitants and is not incorporated as a city, may become incorporated pursuant to this chapter, and when incorporated is a sixth class city."

In *Acosta v. County of San Diego*, 126 Cal.App.2d 455, 272 P.2d 92 (1954) the court held, in general, that Indian lands located within the boundaries of the State are part of the State of California and of the county in which they are situated. In addition, section 34313 of the Government Code of the State of California provides that:

"All lands included within the boundaries of the city are a part of the city. All inhabitants of the city subject to the jurisdiction of the State are subject to the jurisdiction of the city and to all of its ordinances and regulations."

Thus sections 34302 and 34313 of the Government Code of California and the *Acosta* decision make it clear that California permits the inclusion of Federal Indian lands within an incorporated city.

Although §§ 35470 and 35471 of the California Government Code purport to require the consent of the Federal Government before annexation of federally owned lands to a city, these sections were added in 1957, there being no such requirement at the time of the incorporation of Palm Springs in 1938.

■ I conclude, therefore, that the Indian lands in question were legally incorporated into the City of Palm Springs.

DOES THE APPLICATION OF THE CITY'S ZONING ORDINANCE TO INDIAN TRUST LAND CONSTITUTE AN UNLAWFUL INTERFERENCE WITH TRIBAL SOVEREIGNTY?

At this point, some digression into the history of the California Indian and his problems may be profitable.

After the Treaty of Guadalupe Hidalgo in 1848, which marked the end of the Mexican War, the California Indian came within the jurisdiction of the United States for the first time. Upon receiving disturbing reports of the abusive treatment which the Indians were receiving from the White man and the widespread destitution and misery which were apparent among their numbers, Congress enacted the General Allotment

Act of 1887 [2] and the Mission Indian Relief Act of 1891.[3] The legislative history of both of these enactments makes clear the congressional intent to set apart by Executive Grants specific areas of the public domain for the Indians in order to provide them with agricultural lands and permanent homes. The Federal Government holds title to the lands in trust and maintains exclusive jurisdiction over them in order to preserve them for their ultimate conveyance to the Indians, in fee, without lien or encumbrance or Government restriction, when the Indians' cultural development, in the eyes of Congress, makes such conveyances advisable. During the trusteeship, the Indians have the right to occupy the land, with all the incidence of ownership, subject only to such limitations as Congress, from time to time, sees fit to impose. This intent was implemented by the issuance of trust patents, and in the case of the Agua Calientes some 34,000 acres were allotted to them in the form of alternate square mile parcels forming a checkerboard of Indian lands, the intervening square mile areas remaining in non-Indian ownership.

By 1953, Congress was well aware that, with the rapidly growing population and land development in areas adjacent to some Indian lands, uniform regulations were necessary and that such regulations could be more efficiently and effectively administered by the States than by the Indian Service.[4] In that year Congress enacted Public Law 280 [5]

2. General Allotment Act of 1887, 24 Stat. 388, 25 U.S.C.A. § 331, et seq.

3. Mission Indian Relief Act of 1891, 26 Stat. 712, Act Jan. 12, 1891.

4. The House report on H.R. 5310 [H.Rep. No.956, 81st Cong. 1st Sess. (1949)], related that the purpose of the bill was "to confer jurisdiction on the State of California over the lands and residents of the Agua Caliente Indian Reservation . . . ." Recognizing that Indian lands in Palm Springs were "intermingled in a checkerboard pattern with highly developed urban land of great value," the Committee indicated that this "unique problem" might be "clarified." "As the Indian lands are intermingled with the non-Indian lands law and order could be more efficiently and effectively administered by the State than by the Indian Services . . . ." H.R.Rep.No.956, at 2. S.Rep.No.669 (1949) contains essentially the same language.

5. The pertinent provisions of Pub.L. 280 in so far as they relate to the grant of full civil and criminal jurisdiction to the State of California are found in Title 28 U.S.C. § 1360 and Title 18 U.S.C. § 1162. The following provisions of Title 28 U.S. C. § 1360 relate to civil jurisdiction:

"(a) Each of the States or Territories listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over other civil causes of action, and those civil laws of such State or Territory that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory:

| State or Territory of | Indian country affected |
|---|---|
| . . . | . . . |
| California | All Indian country within the State |
| . . . | . . . |

"(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

"(c) Any tribal ordinance or custom heretofore or hereafter adopted by an Indian tribe, band, or community in the exercise of any authority which it may possess shall, if not inconsistent with any applicable civil law of the State, be given full force and effect in

(28 U.S.C. § 1360) by which it expressly granted to the State of California, and consequently to cities and counties within its boundaries, "jurisdiction over civil causes of action between Indians, or to which Indians are parties" and also jurisdiction over criminal offenses committed by or against Indians. This jurisdictional grant was limited, however, to the extent that its exercise could not conflict with federal treaties, agreements, or statutes, or regulations made pursuant thereto.

The House and Senate Committee Reports [H.R.Rep.No.848, 83d Cong., 1st Sess. (1953), adopted verbatim in S. Rep.No.699, 83d Cong. 1st Sess. (1953)] indicate clearly that all state and local police power regulations not in conflict with federal treaties, agreements or statutes were to apply. A portion of the report reads:

"Similarly, the Indians of several States have reached a state of acculturation and development that makes desirable extension of State civil jurisdiction to the Indian country with-

in their borders. Permitting the State courts to adjudicate civil controversies arising on Indian reservations, and to extend to those reservations the substantive civil laws of the respective States insofar as those laws are of general application to private persons or private property, is deemed desirable." (1953 U.S.Code Cong. and Adm.News, p. 2412.)

Plaintiffs argue that the sole purpose for the enactment of Public Law 280 was to permit the better administration and preservation of law and order and that, insofar as it purports to grant to the state jurisdiction over civil causes of action, Congress merely meant judicial jurisdiction to take and decide civil cases applying state law. Actions for trespass, nuisance and auto accidents are given as examples, but Public Law 280, so plaintiffs say, was never intended to permit the state to regulate the use of land administratively.

■ The express language of the statute and its legislative history indicate, I think, to the contrary. Whatever

the determination of civil causes of action pursuant to this section."
[Added Aug. 15, 1953, c. 505, § 4, 67 Stat. 589, amended Aug. 24, 1954, c. 910, § 2, 68 Stat. 795; Aug. 8, 1958, Pub.L. 85–615, § 2, 72 Stat. 545.]
In so far as criminal jurisdiction is concerned, 18 U.S.C. § 1162 provides:
"(a) Each of the States or Territories listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over offenses committed elsewhere within the State or Territory, and the criminal laws of such State or Territory shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory:

| State or Territory of | Indian country affected |
|---|---|
| . . . | . . . |
| California | All Indian country within the State |
| . . . | . . . |

"(b) Nothing in this section shall authorize the alienation, encumbrance, or

taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof.

"(c) The provisions of sections 1152 and 1153 of this chapter shall not be applicable within the areas of Indian country listed in subsection (a) of this section as areas over which the several States have exclusive jurisdiction. [Added Aug. 15, 1953, c. 505, § 2, 67 Stat. 588, and amended Aug. 24, 1954, c. 910, § 1, 68 Stat. 795; Aug. 8, 1958, Pub.L. 85–615, § 1, 72 Stat. 545; Nov. 25, 1970, Pub.L. 91–523, §§ 1, 2, 84 Stat. 1358.]

else Congress may have had in mind, it intended to grant to the state the full exercise of police power, including the authority to make and enforce against Indians and non-Indians alike, upon lands both Indian and non-Indian, rules and regulations pertaining to such things as traffic control, fire control, building safety, health, sanitation, and zoning. The statute itself speaks in even broader terms in referring to

> "[T]hose civil laws of such State or Territory that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory . . ."

That Congress intended by Public Law 280 to restore full police power jurisdiction to the State of California is further borne out by the passage of H.R.Con.Res. 108, 83d Cong., 2d Sess., 67 Stat. B132, passed barely two weeks before the enactment of Public Law 280, which declared:

> "Whereas it is the policy of Congress, as rapidly as possible, to make the Indians within the territorial limits of the United States subject to the same laws and entitled to the same privileges and responsibilities as are applicable to other citizens of the United States . . . .
>
> "That it is declared to be the sense of Congress that, at the earliest possible time, all the Indian tribes and individual members thereof located within the States of California . . . should be freed from the federal supervision and control and from all disabilities and limitations specially applicable to Indians . . . ."

The plaintiffs further urge that zoning regulations are, in fact, "encumbrances" upon the land and, as such, are prohibited by a proviso contained in Public Law 280, which reads:

> "Nothing in this section shall authorize the alienation, *encumbrance*, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; . . . ." [Emphasis added]

In support of their position, the plaintiffs rely heavily upon Snohomish County v. Seattle Disposal Co., 70 Wash.2d 668, 425 P.2d 22 (1967), cert. denied, 389 U.S. 1016, 88 S.Ct. 585, 19 L.Ed.2d 662 (1967), in which the Washington Supreme Court found that zoning laws were "encumbrances" since they diminished the value of the land. This contention and the holding of the majority of the court in the *Snohomish* case have been considered in several recent cases and have been rejected. In Ricci v. County of Riverside, et al., 71–1134–EC (C.D.Calif.1971) Judge Crary of this court, referring to the *Snohomish* case and after quoting from the majority of the court, had this to say:

> "Judge Hale, in dissenting, urges that the zoning laws are not encumbrances but rather an exercise of police power to foster public welfare, health and safety. The Judge also points out that although zoning does impair the use of the land that zoning laws have never been held to be an encumbrance on real estate, as that term is contemplated under applicable law, but are exercised as police power of the governing authority."

Judge Crary held:

> "Building ordinances, although they may be said to technically interfere with the use of land, have not been deemed to be encumbrances on the land and are lawful means of fostering the general welfare and contributing to the public health and safety under the police power."

In People v. Rhoades, 12 Cal.App.3d 720, 90 Cal.Rptr. 794 (1970), the California District Court of Appeal considered the enforcement of § 4291 of the California Public Resources Code requiring the maintenance of a firebreak

around buildings under certain specified conditions. The defendant, an Indian, was charged with violating the provisions of the section by failing to maintain the required firebreak upon Indian Trust lands. The court held that the state statute did not constitute an encumbrance on the land involved within the provisions of Public Law 280 and that § 4291 of the California Public Resources Code was a valid exercise of police power by the state. In discussing the ruling in the *Snohomish* case, the court said:

"As we view it, it would not be a burden upon Rhoades' land 'depreciative of its value' to require that it be so maintained as not to be a hazard to forest lands in general and to Rhoades' lands in particular. We prefer the more common sense approach of dissenting judge Hale and the other dissenting judges in *Snohomish*. The dissenting opinion says (on pp. 27–28): 'The broad general meaning employed by the majority . . . is not called for by the statute. The term "encumbrance" should be given its more . . . precise meaning—one denoting a burden on the land and affecting the title thereto or one impairing the power of alienation such as a mortgage, lien, easement, lease, or other disability to fee ownership.' In short, this court takes the position that by 'encumbrance' Congress intended to protect the Indian against his own profligacy—against those who throughout history have exploited the Indian. And we direct attention to the fact that in Public Law 280 the word 'encumbrance' (in the restrictive sentence referred to above) is used in the same series as the word 'alienation.'" 12 Cal.App.3d at 724, 90 Cal.Rptr. at 797.

In Rincon Band of Mission Indians v. County of San Diego, 324 F.Supp. 371, 376 (S.D.Cal.1971), the court considered a San Diego County ordinance prohibiting the letting or use of Rincon Indian Reservation land for gambling purposes. In discussing "encumbrance" and after alluding to the *Snohomish* case, the court said:

"Whatever the term encumbrance denotes in Washington law, this court finds no warrant for expanding the definition of encumbrance as that term appears in Public Law 280 beyond its usual application indicating a burden on the land imposed by third persons which may impair alienability of the fee, such as a mortgage, lien, or easement. See Snohomish County v. Seattle Disposal Company, 70 Wash.2d 668, 674, 425 P.2d 22, 28 (1967) (Dissenting Opinion). Cf. Kirkwood v. Arenas, 243 F.2d 863, 867 (9th Cir. 1957)."

It is not necessary here to discuss with any degree of exactness what aspects of sovereignty still reside with the Agua Calientes. But whatever attributes of sovereignty they do possess may be overridden, suppressed or entirely eliminated by Acts of Congress, which has plenary authority over Indian lands. Subsection (c) of 28 U.S.C. § 1360 provides:

"Any tribal ordinance or custom heretofore or hereafter adopted by an Indian tribe, band, or community in the exercise of any authority which it may possess shall, *if not inconsistent with any applicable civil law* of the State, be given full force and effect in the determination of civil causes of action pursuant to this section. [Emphasis added]

The sovereignty argument was presented and answered by the court in Rincon Band of Mission Indians v. County of San Diego, *supra*, when it said:

"There is no doubt that a residual sovereignty remains in Indian tribes even in those states where Public Law 280 operates. There is nothing in policy or law, however, which indicates that this limited self government inhering in the Indian tribes may rise to challenge state law. For the tribe to preempt the county ordinance means that the Rincon Band would be

assuming a co-equal authority with the cities and counties which have legislated on this subject. To in effect constitute the Rincon Band a local government with authority comparable to that exercised by cities and counties under the provisions of Article 11, Section 7 of the California Constitution would require more than a policy authorization, and such authorization simply does not exist." 324 F.Supp. at 378.

If Congress has plenary authority to override tribal sovereignty, then by the enactment of Public Law 280 it has done just that and has vested the State of California and its cities and counties with governmental authority superior to the authority retained by the tribe.

█ I hold, therefore, that the zoning ordinance as applicable to Indian Trust lands does not constitute any illegal interference with tribal sovereignty.

## IS PUBLIC LAW 280 UNCON-STITUTIONAL?

Plaintiffs attack Public Law 280 as unconstitutional upon two grounds: that it is a denial of due process and that it constitutes an impermissible delegation of authority.

Plaintiffs first assert that it is an unconstitutional denial of equal protection because it concludes that only some Indians are no longer in need of federal supervision, whereas it should have been made applicable to all Indians on a national basis.

█ "Equal protection of the laws" is a concept expressed in the Fourteenth Amendment, which Amendment is applicable to the States only, not to the United States. However, the principle is to a degree subsumed within the "due process" concept of the Fifth Amendment, which governs federal action.

"The Fifth Amendment . . . does not contain an equal protection clause as does the Fourteenth Amendment which applies only to the states.

But the concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive. The 'equal protection of the laws' is a more explicit safeguard of prohibited unfairness than 'due process of law,' and, therefore, we do not imply that the two are always interchangeable phrases. But, as this Court has recognized, discrimination may be so unjustifiable as to be violative of due process." Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

To make out a case of denial of due process, the plaintiffs must show that Public Law 280 bears no reasonable relationship to a proper governmental objective. Bolling v. Sharpe, *supra*.

I have previously discussed the power of Congress to terminate the trusteeship of Indian lands at such time as Congress, in its best judgment, should determine. It was pointed out in Kennerly v. District Court, 400 U.S. 423, 424, n. 1, 91 S.Ct. 480, 481, 27 L.Ed.2d 507 (1971) that the very fact Congress has limited Public Law 280 to five states is "illustrative of the detailed regulatory scrutiny which Congress has traditionally brought to bear on the extension of state jurisdiction, whether civil or criminal, to actions to which Indians are parties arising in Indian country."

█ Since the expressed governmental objective of the trust in the first place was to protect the Indian, a withdrawal of Congress of such protection upon the basis of the stage of "acculturation and development" which the Indian has attained, the differential treatment bears a relation to the proper governmental objective. Plaintiffs cite as an example the fact that Indians living in California are subjected to state law, whereas Indians similarly situated in the State of Arizona are not. It is true that the provisions of Public Law 280 were not made applicable to the Indians in Arizona and that they were, in fact, given specific authority by Congress to

make their own zoning regulations,[6] but this was done as the Act and legislative history make clear because the State of Arizona refused to assume jurisdiction to do so. It was further made clear that such grant of police power would be given Arizona whenever it was willing to accept it.[7]

As a second constitutional objection to Public Law 280, plaintiffs argue that the power given Congress "to regulate commerce with the Indians" (United States Constitution Article I, § 8, cl. 3) is a non-delegable power.

■ Although this power over the Indians is sometimes referred to as "plenary", and sometimes as "absolute", these are not synonymous with "exclusivity" as the plaintiffs argue. See Organized Village of Kake v. Egan, 369 U. S. 60, 67, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962); Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). In Williams v. Lee, *supra* at 221, 79 S.Ct. at 271, the Court said:

"Significantly, when Congress has wished the States to exercise this power it has expressly granted them the jurisdiction which Worcester v. Georgia had denied.[6]

6. On November 2, 1966, Congress enacted Public Law 89–715, 80 Stat. 1112, (25 U.S.C. §§ 416–416j) concerning the leasing of land on the San Xavier and Salt River Pina-Maricopa Indian Reservations in Arizona. Section 9 (25 U.S.C. § 416h) of the Act provides as follows:

"The Papago Council and the Salt River Pima-Maricopa Community Council, with the consent of the Secretary of the Interior, are hereby authorized, for their respective reservations, to enact zoning, building and sanitary regulations covering the lands on their reservations for which leasing authority is granted by this Act in the absence of State civil and criminal jurisdiction over such particular lands, and said councils may contract with local municipalities for assistance in preparing such regulations." [1966 U.S.Code Cong. and Adm.News, p. 1302.]

"6. See, e. g., 62 Stat. 1224, 64 Stat. 845, 25 U.S.C. §§ 232, 233 (1952) (granting broad civil and criminal jurisdiction to New York); 18 U.S.C. § 1162, 28 U.S.C. § 1360 (granting broad civil and criminal jurisdiction to California, Minnesota, Nebraska, Oregon, and Wisconsin) . . . ."

This matter has been put to rest in this Circuit by Anderson v. Gladden, 293 F.2d 463, 468 (9th Cir. 1961). There the court said:

"We further agree with the state court's holding on the question of the power of Congress to relinquish this jurisdiction [i. e., to enact P.L. 280] in favor of the states. The power over Indians was deemed not so inherently or exclusively federal as to apply beyond the extent to which the federal government has preempted the field, and the federal government could thus withdraw from the field and turn the subject matter back to the states when it chose to do so."

■ In short, there is no merit in the constitutional objections raised by the plaintiffs in regard to Public Law 280.

■ By way of summary, the plaintiffs have, I think, misconceived the pri-

7. Congressman Haley [in 112 Cong.Rec. 27000 (1966)] after pointing out the importance of the immediate exercise of police power jurisdiction including the power to zone land and regulate construction in an Indian reservation concludes:

"Certainly, the Secretary of the Interior should give the State of Arizona a reasonable time to allow it to assume the jurisdiction contemplated by Public Law 280 [sic]. However, it is certainly not my intention that development of these reservations must await forever—this type of action by the legislature of Arizona. We have no way of knowing whether the legislature will ever act or not. It would certainly be manifestly unfair to make the Indians wait for an indeterminate period of time to develop their lands, pending the resolution of a situation which is not in their control, and over which they have no possibility of control."

ority of sovereignty as it exists in the relationship of the tribe to the Federal Government and to the state. Congress, under the constitutional power to regulate commerce with the Indians, has preempted the field of regulation of Indian land to the extent that such is necessary to protect the Indian's right therein and to preserve title thereto until the day when the Indian has developed culturally to a point where he can deal with and manage his own affairs.

Congress in recent years has recognized that Indians in some states, California being one, have reached a state of acculturation where some federal controls might properly be relaxed. Congress, also, has recognized that the intermingling of Indians and their lands with their non-Indian counterparts has necessitated the bringing of regulatory control under a single head.

Public Law 280, like other similar laws in recent years, is a withdrawal by Congress from its preemption in this field. It has done so in this case by express grant to the state of authority, among other things, to exercise its police power in such a way as to impose upon Indian lands the same regulations imposed upon all lands within the boundaries of the state. To the extent that any further withdrawal by the Federal Government occurs, the sovereignty of the state becomes enlarged to that extent.

We need not consider, here, the nature and extent of the sovereignty enjoyed by the Indian tribe, except that 28 U.S.C. § 1360(c) makes it clear that the exercise of such sovereignty as the Indian tribe may possess must not conflict with the state law.

I hold, therefore:

1. That the Indian land in question was legally incorporated into the City of Palm Springs.

2. That the City's zoning ordinances apply to and are enforceable upon Indian lands to the same extent and with the same effect as they are enforceable upon non-Indian land.

3. That Public Law 280, granting as it does to the State of Claifor, authority to exercise its police power over Indian lands, is not unconstitutional.

Judgment shall, therefore, be for the defendants, and defendants' counsel shall prepare and submit appropriate findings of fact, conclusions of law and judgment.