Argued and submitted December 7, 2010, reversed and remanded October 26, 2011, both petitions for review denied May 17, 2012 (352 Or 33)

Sarah NORDBYE,
individually
and on behalf of all others similarly situated,
*Plaintiff-Appellant,*

*v.*

BRCP/GM ELLINGTON,
an Oregon limited liability corporation;
and the OREGON HOUSING AND
COMMUNITY SERVICES DEPARTMENT,
*Defendants-Respondents.*

Multnomah County Circuit Court
071113782; A141698

266 P3d 92

Alice Warner argued the cause for appellant. With her on the briefs was Edward Johnson.

Thomas H. Tongue argued the cause for respondent BRCP/GM Ellington. With him on the brief were Brian R. Talcott and Dunn Carney Allen Higgins & Tongue LLP.

Judy C. Lucas, Senior Assistant Attorney General, argued the cause for respondent Oregon Housing and Community Services Department. With her on the brief were

John R. Kroger, Attorney General, and David B. Thompson, Interim Solicitor General.

Jeffrey B. Litwak filed the brief *amicus curiae* for Columbia River Gorge Commission.

Dennis Steinman and Kell Alterman & Runstein, LLP, filed the brief *amicus curiae* for National Housing Law Project.

Mark Manulik, Sara Kobak, and Schwabe, Williamson & Wyatt, P.C., filed the brief *amicus curiae* for Oregon Land Title Association.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Duncan, Judge.

HASELTON, P. J.

## HASELTON, P. J.

Plaintiff, a former tenant of a residential rental property that was financed, at least in part, through the federal Low-Income Housing Tax Credit (LIHTC) program, appeals.[1] Plaintiff challenges (1) the trial court's allowance of summary judgment, on grounds of *"Chevron* deference,"[2] against her claims for injunctive and declaratory relief pertaining to the enforceability of certain "use restrictions" related to the LIHTC program; and (2) the court's denial of her cross-motion for summary judgment. As described below, we conclude that *Chevron* deference is inapposite. We further conclude that, as a matter of law, plaintiff is entitled to enforce the disputed use restrictions pertaining to the operation of the property as low-income housing. Accordingly, we reverse and remand.

Before turning to the particular circumstances of this dispute, it is not only useful, but essential, to describe the LIHTC program. The purpose of the LIHTC program is to encourage the development of low-income rental housing through the allocation of tax credits pursuant to section 42 of the Internal Revenue Code (IRC). *Oti Kaga v. South Dakota Housing Dev. Authority*, 188 F Supp 2d 1148, 1152 (D SD 2002), *affd*, 342 F3d 871 (8th Cir 2003). In general, the federal government allocates tax credits, and state housing agencies are responsible for distributing the credits and monitoring recipient projects for compliance with program requirements. Treas Reg § 1.42-1T; Treas Reg § 1.42-5. The LIHTC program is regulated by, and state housing agencies report to, the Internal Revenue Service. IRC § 42(l), (n). Further, as a general rule, the tax credits are claimed annually by the recipient taxpayer over the first 10 years of a project. IRC § 42(f)(1); Treas Reg § 1.42-1T(a)(1). In return for receiving the tax credits, the taxpayer must commit to maintain the project as low-income housing for 30 years. The 30-year

---

[1] Defendant BRCP/GM Ellington (BRCP) is the current owner of the property. Defendant Oregon Housing and Community Services Department (the Department) is responsible for monitoring property owners' compliance with LIHTC program requirements, as was its predecessor entity, the Oregon Housing Authority. For ease of reference, we refer to both entities as "the Department."

[2] *Chevron USA, Inc. v. Natural Res. Def. Council*, 467 US 837, 104 S Ct 2778, 81 L Ed 2d 694 (1984).

term is composed of an initial 15-year compliance period and an additional 15-year "extended use period." IRC § 42(h)(6).

For our purposes, it is not necessary to describe the LIHTC program rental and occupancy restrictions in detail. Suffice it to say there are three salient features. *First*, the taxpayer agrees that a specified number of units in the project will be rented for a restricted amount of rent to tenants whose income is a certain percentage less than the median income of the geographical area in which the project is located. *See* IRC § 42(g). *Second*, federal law requires that the taxpayer and state housing agency enter into an "extended low-income housing commitment," which is to be "binding on all successors of the taxpayer," and recorded as a restrictive covenant pursuant to state law. IRC § 42(h)(6)(A), (B). *Third*, "individuals who meet the income limitation applicable to the building * * * (whether prospective, present, or former occupants of the building)" have the right to enforce the extended low-income housing commitment "in any State court."[3] IRC § 42(h)(6)(B)(ii).

Consistently with those requirements, in December 1990, Rose City Village Limited Partnership, the original owner of the project, entered into a Low-Income Housing Tax Credit Reservation and Extended Use Agreement (the extended use agreement) with the Department. The original owner agreed, among other things, that it would maintain 100 percent of the project as low-income housing for 30 years and that, as a condition precedent to the issuance of tax credits, it would record a "declaration of land use restrictive covenants."

In the Declaration of Land Use Restrictive Covenants for Low-Income Housing Tax Credits (the declaration), which was recorded in Multnomah County, the original owner acknowledged the obligations and restrictions imposed under the extended use agreement. Section 2(b) of the declaration provides:

---

[3] BRCP argued before the trial court that plaintiff did not meet the income limitation applicable to the building and, thus, that she lacked standing to bring this action. The trial court found that plaintiff satisfied the IRC section 42 income limitations, and BRCP does not challenge that finding on appeal.

"The Owner intends, declares and covenants, on behalf of itself and all future Owners and operators of the Project during the term of this Declaration, that this Declaration and the covenants and restrictions set forth in this Declaration regulating and restricting the use, occupancy and transfer of the Project ([1]) shall be and are covenants running with the Project land, encumbering the Project for the term of this Declaration, binding upon the Owner's successors in title and all subsequent Owners and Operators of the Project[,] ([2]) are not merely personal covenants of the Owner, and ([3]) shall bind the Owner (and the benefits shall inure to the Department and any past, present or prospective tenant of the Project) and its respective successors and assigns during the term of this Declaration. The Owner hereby agrees that any and all requirements of the laws of the State of Oregon to be satisfied in order for the provisions of this Declaration to constitute deed restrictions and covenants running with the land shall be deemed to be satisfied in full, and that any requirements of privileges [*sic*] of estate are intended to be satisfied, or in the alternate, that an equitable servitude has been created to insure that these restrictions run with the Project. For the longer of the period this Credit is claimed or the term of this Declaration, each and every contract, deed or other instrument hereafter executed conveying the Project or portion thereof shall expressly provide that such conveyance is subject to this Declaration, provided, however, the covenants contained herein shall survive and be effective regardless of whether such contract, deed or other instrument hereafter executed conveying the Project or portion thereof provides that such conveyance is subject to this Declaration."

Further, and of critical significance, section 8 of the declaration, which is captioned "Enforcement of Section 42 Occupancy Restrictions," provides, in part:

"(b)   The Owner acknowledges that the primary purpose for requiring compliance by the Owner with restrictions provided in this Declaration is to assure compliance of the Project and the Owner with IRC Section 42 and the applicable regulations, AND BY REASON THEREOF, THE OWNER IN CONSIDERATION FOR RECEIVING LOW-INCOME HOUSING TAX CREDITS FOR THIS PROJECT HEREBY AGREES AND CONSENTS THAT THE DEPARTMENT AND ANY INDIVIDUAL WHO MEETS

THE INCOME LIMITATION APPLICABLE UNDER SEC-
TION 42 (WHETHER PROSPECTIVE, PRESENT OR
FORMER OCCUPANT) SHALL BE ENTITLED, FOR
ANY BREACH OF THE PROVISIONS HEREOF, AND IN
ADDITION TO ALL OTHER REMEDIES PROVIDED BY
LAW OR IN EQUITY, TO ENFORCE SPECIFIC PER-
FORMANCE BY THE OWNER OF ITS OBLIGATIONS
UNDER THIS DECLARATION IN A STATE COURT OF
COMPETENT JURISDICTION. The owner hereby further
specifically acknowledges that the beneficiaries of the
Owner's obligations hereunder cannot be adequately com-
pensated by monetary damages in the event of any default
hereunder."

(Uppercase in original.)

The Department allocated more than $2 million of
LIHTC tax credits to the project and monitored the project
for conformity with LIHTC program requirements. The pro-
ject experienced compliance problems over the years. In
the course of trying to remediate those problems, the
Department learned that, in 2002 or 2003, the original owner
had transferred ownership of the project to Rose City Village
Affordable Housing Limited Partnership (the middle owner).
The manner in which the original owner transferred the pro-
ject violated the terms of the declaration. The declaration
requires, among other things, that the owner notify the
Department prior to any transfer of ownership and that the
owner obtain the agreement of any buyer "that such acquisi-
tion is subject to the requirements of" the declaration and
IRC section 42. Those requirements were not satisfied.

The Department ultimately concluded that,
although the middle owner had made substantial progress in
some respects, the project could not be brought into full com-
pliance with all of the requirements of the LIHTC program.[4]
In 2004, a Department compliance officer notified the
Internal Revenue Service (IRS) of that conclusion in a letter,
which stated, in part:

---

[4] A Department employee subsequently identified the "largest problem" as the
original owner's failure to properly document the income eligibility of the initial
project tenants. Although the parties disagree about whether the Department was
justified in determining that full compliance was an impossibility, we need not
resolve that dispute in that it is immaterial to our analysis and disposition.

"Due to the severity of the noncompliance issues relating to this project, it has been determined that this project is not currently, is unlikely to be in the future, and may not have ever been in compliance. It is apparent that the Owner failed to make reasonable attempts to comply with the requirements of the Program. Therefore, because of the egregious nature of the noncompliance, it is the decision of [the Department] to remove this project from the Low-Income Housing Tax Credit Program."

With that letter, the Department also submitted multiple IRS 8823 forms, entitled "Low-Income Housing Credit Agencies Report of Noncompliance or Building Disposition."[5] The Department checked the same preprinted box on each form, indicating that the "[p]roject is no longer in compliance nor participating in the low-income housing tax credit program[.]" The federal government ultimately recaptured a portion of the tax credits that had been allocated to the project.[6]

In 2005, the middle owner and the Department entered into a Settlement, Satisfaction and Partial Release Agreement (the release agreement). The release agreement recites that "the parties desire to resolve all outstanding issues between them by means of this Agreement" and provides, in part:

"1.  MUTUAL RELEASE.

"The parties hereby release one another from all claims, causes of action, suits, and other liabilities, actual or potential, arising out of or related to the allocation and subsequent rescission of the low-income housing tax credits and the execution and recording of the related Declaration referenced above, except as specifically indicated herein.

"2.  SATISFACTION AND PARTIAL RELEASE OF DECLARATION.

"The Department hereby provides its satisfaction and partial release of that Declaration except with respect to

---

[5] The Department submitted a separate form for each building in the project.

[6] From the record before us, the extent of that recoupment is unclear.

Section 6 (c)[7] thereof which shall remain in effect for three years from the date of this Agreement. For the three years that Section 6 (c) remains in effect, the [middle owner], and any successor in interest thereto, or other owner of the Property, shall not evict or terminate the tenancy of an existing tenant of any low-income unit on the Property other than for good cause and shall not increase the gross rent above the maximum allowed under the IRC with respect to such low-income units."

Shortly after it was executed, the release agreement was recorded in Multnomah County.

In 2006, the middle owner sold the project to the present owner, BRCP, for a very substantial profit. Later in that same year, and despite the three-year "safe harbor" provision of the release agreement, BRCP issued a 30-day, no-cause eviction notice to plaintiff, among other tenants. Plaintiff stated in her declaration that, by the time she vacated her apartment in response to the eviction notice, almost all of her neighbors had moved, and the project "was like a ghost town." BRCP does not operate the project in a manner that complies with the restrictions of the LIHTC program and declaration. For example, at the time of the summary judgment proceedings below, BRCP did not screen tenants for income eligibility or rent exclusively to tenants who qualified as "low-income" under section 42 of the Internal Revenue Code.

Plaintiff subsequently filed this action, seeking declaratory and injunctive relief to enforce the original owner's commitment to maintain the property as low-income housing for the remainder of the declaration's 30-year term.

---

[7] Section 6(c) of the declaration provides:

"Notwithstanding subsection (b) above, IRC Section 42 rent requirements shall continue for a period of three years following the termination of the extended use requirement pursuant to the procedures specified in subsection (b) above for those tenants existing as of the date of termination. During such three year period, the Owner shall not evict or terminate the tenancy of an existing tenant of any low-income unit other than for good cause and shall not increase the gross rent above the maximum allowed under the IRC with respect to such low-income unit."

"Subsection (b)" of the declaration referenced in the excerpt set forth immediately above, along with section 6(c) of the declaration, mirrors, in substance, IRC § 42(h)(6)(E), set out below. *See* 246 Or App at 220 n 11.

BRCP and the Department jointly moved for summary judgment, arguing that the release agreement is "valid and enforceable against plaintiff and other current and future tenants[.]" In so contending, defendants asserted, in part, that *Chevron* deference should be accorded to the Department's decision to execute the 2005 release agreement. Plaintiff opposed defendants' motion for summary judgment and filed a cross-motion, asserting that the release agreement did not, and could not, abrogate her right to obtain specific performance of the declaration.

The trial court granted defendants' motion for summary judgment and denied plaintiff's cross-motion. The court determined that the Department's decisions to "terminate" the project from participation in the LIHTC program and enter into the release agreement effectively abrogated the ability of low-income tenants to obtain specific performance of the declaration.[8] That holding was predicated on the trial court's conclusion that the Department's decisions to remove the project from the LIHTC program and enter into the release agreement with the middle owner were entitled to deference under the principles set forth in *Chevron USA, Inc. v. Natural Res. Def. Council*, 467 US 837, 104 S Ct 2778, 81 L Ed 2d 694 (1984). The court thereafter entered a general judgment of dismissal.

Plaintiff appeals, assigning error to the allowance of defendants' motion for summary judgment and to the denial of her cross-motion for summary judgment.[9] In an appeal

---

[8] The release agreement does not explicitly address the rights conferred on low-income tenants in the declaration. Instead, the middle owner and the Department state in the release agreement that they "desire to resolve all outstanding issues *between them*" and that they are releasing "*one another*." (Emphasis added.) Although an argument could be made that the parties never intended that the release agreement would have any effect on the right of a qualified tenant to enforce the use restrictions set forth in the declaration, no such argument was made before the trial court or has been made on appeal. It appears that the parties and the trial court assumed that the middle owner and the Department intended that the release agreement would extinguish the enforcement rights conferred on low-income tenants.

[9] Earlier in this appeal, BRCP filed a motion to dismiss for lack of jurisdiction, arguing that this court lacks jurisdiction because plaintiff's exclusive remedy is under the Administrative Procedures Act (ORS chapter 183). The Appellate Commissioner denied the motion, and BRCP renews its jurisdictional argument in its answering brief. We deny BRCP's renewed motion to dismiss for the reasons stated by the commissioner in the court's order entered on April 29, 2010.

from a judgment that results from cross-motions for summary judgment,

> "if both the granting of one motion and the denial of the other are assigned as error, then both are subject to review. Each party that moves for summary judgment has the burden of demonstrating that there are no material issues of fact and that the movant is entitled to judgment as a matter of law. We review the record for each motion in the light most favorable to the party opposing it."

*Eden Gate, Inc. v. D&L Excavating & Trucking, Inc.*, 178 Or App 610, 622, 37 P3d 233 (2002) (citations omitted). As amplified below, we conclude that deference under *Chevron* is not warranted and that the 2005 release agreement did not abrogate plaintiff's right to enforce the original use restrictions prescribed in the 1990 declaration. Accordingly, the trial court erred in granting defendants' motion for summary judgment and in denying plaintiff's cross-motion.

We begin with the trial court's basis for disposition— *viz.*, deference in accordance with the principles set forth in *Chevron*.[10] In *Friends of Columbia Gorge v. Columbia River (S055722)*, 346 Or 366, 378, 213 P3d 1164 (2009), the court generally described the application of deference under *Chevron*:

> "A long line of federal cases, beginning with *Chevron*, * * * holds that, when a federal agency has been charged by Congress with implementing a federal statute, courts should defer to that agency's interpretation of the statute, treating that interpretation as controlling as long as it is reasonable."

However, deference is appropriate only where "Congress has not directly addressed the precise question at issue[.]" *Chevron*, 467 US at 843. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43.

---

[10] Although the Department argued before the trial court that *Chevron*-style deference was appropriate, it has abandoned that argument on appeal and, in fact, now argues that *Chevron* deference is inapposite. BRCP, however, defends the trial court's rationale.

Here, invoking *Chevron* deference, the trial court noted that the Internal Revenue Code explicitly identifies two situations in which the extended-use period will terminate early (neither of which was applicable in the circumstances of this case).[11] Nevertheless, the court reasoned that that identification was not necessarily exclusive and, thus, "Congress was silent" as to whether, in other circumstances, local housing agencies can voluntarily terminate a project's participation in the LIHTC program before the end of the extended-use period. Proceeding from that premise, the trial court concluded that,

> "[i]n light of the fact that some areas of noncompliance could never be remedied[,] it was reasonable for the agency to determine that the property owner would be unable to bring the property into compliance. Because [the Department] acted reasonably, the court will defer to its interpretation of the statute. This leaves the remaining question as to whether [the Department and the middle owner] needed to give the tenants notice and obtain their consent prior to modification of the Declaration."

As to that "remaining question," the court concluded that Congress had not directly addressed the subject and that the

---

[11] IRC section 42(h)(6)(E) provides:

"(i) In general.—The extended use period for any building shall terminate—

"(I) on the date the building is acquired by foreclosure (or instrument in lieu of foreclosure) unless the Secretary determines that such acquisition is part of an arrangement with the taxpayer a purpose of which is to terminate such period, or

"(II) on the last day of the period specified in subparagraph (I) if the housing credit agency is unable to present during such period a qualified contract for the acquisition of the low-income portion of the building by any person who will continue to operate such portion as a qualified low-income building.

"Subclause (II) shall not apply to the extent more stringent requirements are provided in the agreement or in State law.

"(ii) Eviction, etc. of existing low-income tenants not permitted.—The termination of an extended use period under clause (i) shall not be construed to permit before the close of the 3-year period following such termination—

"(I) the eviction or the termination of tenancy (other than for good cause) of an existing tenant of any low-income unit, or

"(II) any increase in the gross rent with respect to such unit not otherwise permitted under this section."

"actions" of the parties to the release agreement "were reasonable and will be entitled to deference."

The court's invocation of *Chevron* deference was erroneous because the Department is not an entity to which deference is warranted under *Chevron*. The Department is an agency established under state statute. *See* ORS 456.555(1). "A state agency's interpretation of federal statutes is not entitled to the deference afforded a federal agency's interpretation of its own statutes under *Chevron* * * *." *Orthopaedic Hosp. v. Belshe*, 103 F3d 1491, 1495 (9th Cir 1997).

BRCP suggests, nevertheless, that deference to the Department is warranted under *Chevron* because the circumstances here are analogous to those in *Friends of Columbia Gorge*. We disagree.

In *Friends of Columbia Gorge*, the Oregon Supreme Court held that interpretations by the Columbia River Gorge Commission (Gorge Commission) of certain provisions of the Columbia River Gorge National Scenic Area Act, 16 USC §§ 544-544p, were entitled to *Chevron* deference. In so holding, the court pointed to specific features of the federal authorizing legislation—including those requiring the Gorge Commission to develop, implement, and administer a management plan "in cooperation and consultation with the United States Secretary of Agriculture"—and emphasized that, as a matter of Congressional intent, "[t]he Act clearly contains gaps that the [Gorge] commission is charged with filling." 346 Or at 369-70, 381-82.

Here, in contrast, nothing in the authorizing legislation for the LIHTC program delegates to the Department or other state housing agencies the expansive type of "rulemaking" authority conferred on the Gorge Commission. To the contrary, section 42(n) of the Internal Revenue Code provides that "[t]he Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this section[.]"

BRCP contends, alternatively, that *Chevron* deference applies because an IRS employee's advice informed the Department's decision to remove the project from the LIHTC

program. In particular, BRCP points to evidence that an IRS employee advised the Department in a phone conversation that the project could be "kicked out of" the LIHTC program for noncompliance with program requirements.[12] That argument is unavailing. Only those administrative interpretations that Congress and the agency intend to have the force of law are entitled to *Chevron* deference. *United States v. Mead Corp.*, 533 US 218, 226-27, 121 S Ct 2164, 150 L Ed 2d 292 (2001). The oral advice of a federal employee, given on an *ad hoc* basis to a state agency, simply does not qualify.

In sum, the trial court erred in granting defendants' summary judgment motion based on its application of *Chevron* deference. That, however, is merely the beginning, not the end, of our inquiry. That is so because, as noted, plaintiff has also challenged the denial of her cross-motion for summary judgment, and defendants, individually and collectively, proffer alternative legal bases for affirming the trial court's dismissal of plaintiff's claims. None of the parties suggests that those cross-cutting contentions implicate disputed issues of material fact. For the reasons that follow, we conclude that the 2005 release agreement did not abrogate plaintiff's entitlement to enforce the use restrictions prescribed in the 1990 declaration and that defendants' asserted defenses to the enforcement of those restrictions fail as a matter of law. Accordingly, the trial court erred in denying plaintiff's cross-motion for summary judgment.

We begin with the pertinent provisions of the declaration. In section 2(b) of the declaration, the original owner of the project and the Department agreed that the use restrictions set forth in the declaration would be "covenants running with the Project land," encumbering the project for the term of the declaration and binding all successors in title for the stated duration. *See* 246 Or App at 214. Section 2(b) further provides that the "benefits" of the covenants and restrictions "shall inure to the Department and *any past, present or prospective tenant of the Project.*" (Emphasis added.) Finally,

---

[12] The official position held by the IRS employee is not clear from the record. One Department employee described the IRS employee as being a LIHTC compliance "guru," and another said the IRS employee was in charge of LIHTC compliance at the IRS.

under section 8(b) of the declaration, both the Department *and* "any individual who meets the income limitation applicable under section 42 (whether prospective, present or former occupant) shall be entitled * * * to enforce specific performance" of obligations owed under that document. (Emphasis omitted.) Thus, under the declaration, plaintiff is an intended third-party beneficiary of the use restrictions and, pursuant to section 8(b), she is independently entitled to enforce those use restrictions, even if the Department has waived its ability to do so.

BRCP contends, however, that the release agreement abrogated the use restriction, precluding plaintiff or any other intended beneficiary from enforcing those restrictions. That argument fails because, under Oregon law—which is expressly made applicable by both section 8(e) of the declaration and section 4 of the release agreement—a grantor and grantee cannot terminate a restrictive covenant without the consent of the intended beneficiary. *Snashall et ux v. Jewell et ux*, 228 Or 130, 137-38, 363 P2d 566 (1961).

In *Snashall*, the parties lived in the same subdivision and received their deeds from common grantors. 228 Or at 132. The defendants' deed contained a restrictive covenant prohibiting buildings over one story in height and also contained a covenant that building plans be approved by the common grantors. The defendants, in an attempt to defeat the restrictive covenant, transferred the property back to the original grantors, who then reconveyed the land to the defendants, with the deed of reconveyance effectively omitting the building restriction. *Id*. at 133. The plaintiffs subsequently, successfully brought an action for breach of contract, asserting that the defendants' home violated the restrictive covenants.

The defendants appealed, and the Supreme Court affirmed. In so holding, the court determined that

> "[t]his [reconveyance] maneuver did not, however, operate to change the binding effect of the restrictions contained in the original deed because the covenants which became operative upon the execution of the first deed to defendants *inured to the benefit of the other lot owners in the tract and would continue to bind defendants as to those other owners*

*unless the latter were to release defendants from the obligations of the covenants.* Defendants treat the deed provision calling for the grantors' approval of building plans as vesting in the grantors a dispensing power permitting the lifting of the restriction on any lot at the will of the grantors. We do not so construe the provision; it was intended to provide machinery in the aid of the enforcement of the covenants rather than to provide a means by which the common plan could be weakened by modification. It is manifest from the content of the restrictive covenants that they were imposed for the benefit of the owners of the several lots within the tract rather than for the personal benefit of the grantors."

*Id.* at 137-38 (emphasis added). The Supreme Court concluded that, "by reason of either the theory of third party beneficiary or the theory of implied reciprocal servitude, [the] plaintiffs are entitled to enforce the restrictive covenant contained in [the] defendants' deed." *Id.* at 138. *See also Menstell et al. v. Johnson et al.*, 125 Or 150, 167, 262 P 853 (1927), *reh'g den*, 125 Or 169, 266 P 891 (1928) (restrictive covenant may not be modified "without the consent or acquiescence of the [beneficiaries]").

Plaintiff contends (we believe correctly) that *Snashall* is dispositive. Notwithstanding plaintiff's invocation of *Snashall*, defendants do not directly address *Snashall*, *Menstell*, and the other related cases cited by plaintiff[13]—and offer no principled basis for distinguishing those cases. Defendants appear to suggest, however, that plaintiff's claim is foreclosed by the release agreement because the declaration does not expressly require that qualified tenants consent to release of their interests. The problem with that argument is that the declaration and the release agreement do expressly incorporate Oregon law—including *Snashall*—and nothing in *Snashall* (or any related case) conditions the right of an intended beneficiary to enforce a restrictive covenant on the existence of an express contractual provision requiring

---

[13] *See, e.g., Stan Wiley v. Berg*, 282 Or 9, 15-16, 578 P2d 384 (1978) (a promisor and promisee generally cannot materially alter or abrogate the rights of an intended third-party beneficiary once the beneficiary has "accepted, adopted, or acted upon" the promise made for his or her benefit).

the third-party beneficiary's consent to the material modification or termination of the covenant.

BRCP further argues that, in all events, it is not bound by the use restrictions set forth in the declaration because the declaration did not succeed in creating covenants that run with the land at law.[14] To create a covenant running with the land and binding on successors, four requirements must be met:

> "(1) there must be privity of the estate between the promisor and his successors; (2) the promisor and promisee must intend that the covenant run; (3) the covenant must touch and concern the land of the promisor; and (4) the promisee must benefit in the use of some land possessed by him as a result of the performance of the promise."

*Johnson v. Highway Division*, 27 Or App 581, 584, 556 P2d 724 (1976), *rev den*, 277 Or 99 (1977) (emphasis omitted). Specifically, BRCP argues that the first and fourth requirements are not satisfied.

BRCP's argument fails because the declaration itself expressly provides that all of the requirements under Oregon law for creation of a restrictive covenant running with the land are deemed satisfied. In section 2(b), the parties to the declaration agreed "that any and all requirements of the laws of the State of Oregon to be satisfied in order for the provisions of this Declaration to constitute deed restrictions and covenants running with the land shall be deemed to be satisfied in full[.]" BRCP does not cite, and we are not aware of, any authority supporting the proposition that such an agreement is legally ineffective.

In all events, even if the requisites of the covenant running with the land were somehow not satisfied, BRCP would nevertheless be subject to enforcement of the use restrictions as an equitable servitude. That is so because the original owner and the Department agreed in section 2(b) of the declaration that, in the event that the declaration somehow failed to create covenants running with the land at law,

---

[14] The trial court determined that the declaration was recorded as a restrictive covenant in the property's chain of title, and the Department does not dispute that the declaration successfully created covenants running with the land.

an equitable servitude would be created "to insure that [the] restrictions run with the Project." In *Ebbe v. Senior Estates Golf*, 61 Or App 398, 404-05, 657 P2d 696 (1983), we summarized the elements of an equitable servitude:

> "The general rule is that, even if all technical requirements for a covenant to run with the land are not met, a promise is binding as an equitable servitude if (1) the parties intend the promise to be binding; (2) the promise 'concern[s] the land or its use in a direct and not a collateral way'; and (3) 'the subsequent grantee [has] notice of the covenant * * *.' 20 Am Jur 2d Covenants, § 26 (1965)."

An equitable servitude creates a burden that will fall on subsequent holders of the property " 'with the single qualification that a subsequent owner who acquires the legal estate for value and without notice takes it free from this burden.' " *Hall v. Risley and Heikkila*, 188 Or 69, 99, 213 P2d 818 (1950) (quoting John Norton Pomeroy, 4 *Pomeroy's Equity Jurisprudence* § 1295, 850 (5th ed)). Either actual or constructive notice of the covenant is sufficient to bind a subsequent owner. *Ebbe*, 61 Or App at 405.

BRCP remonstrates that an equitable servitude is inapposite because it did not have actual or constructive notice of the use restrictions set forth in the declaration. The uncontroverted evidence is to the contrary—and, indeed, BRCP had both actual and constructive notice of the covenants. In particular, the individual in charge of due diligence for BRCP's acquisitions acknowledged that she had learned of the existence of the declaration and the covenants included therein before BRCP purchased the project. Thus, BRCP acquired the project with actual notice of the use restrictions. In addition, the recording of the declaration operated to give BRCP constructive notice of the use restrictions imposed by that document. ORS 93.643 (addressing constructive notice from recordation of interest in real property); *see also Huff v. Duncan*, 263 Or 408, 411, 502 P2d 584 (1972).

BRCP argues, however, that it should not be bound by the use restrictions imposed in the declaration because, in deciding to purchase the project, it reasonably relied on the intervening release agreement. BRCP maintains that the

release agreement appeared to be a valid release of the declaration "on its face," rendering the explicit use restrictions of the recorded declaration of "no import." We disagree.

As a threshold matter, BRCP's "facial" characterization of the release agreement is insupportable. As noted, *see* 246 Or App at 218 n 8, nothing in the release agreement expressly addresses the enforcement rights of qualified low-income tenants as third-party beneficiaries of the declaration's use restrictions. Regardless, a purchaser of real property has a duty to examine all documents in the property's chain of title and is "bound by the recitals in the conveyances necessary to his chain of title." *Phair v. Walker, Coe*, 277 Or 141, 144, 559 P2d 882 (1977); *see also Jennings v. Lentz*, 50 Or 483, 490, 93 P 327 (1908) (purchaser must use reasonable diligence in conducting search of documents in chain of title or "assume the risk" of taking property subject to competing interest). BRCP cites no authority in support of its argument that it was entitled to rely on only the release agreement simply because the release agreement was the most recently recorded document in the project's chain of title.[15] Indeed, BRCP's purported reliance on the release agreement in isolation is especially unreasonable given that section 3(o) of the declaration expressly provides that the rights and obligations created by that document will survive and control in the face of inconsistent provisions in later documents.[16]

Finally, BRCP posits that the release agreement extinguished plaintiff's enforcement rights because the declaration provides that it can be amended "as may be necessary to comply with the [Internal Revenue Code], any and all

---

[15] The Oregon Land Title Association (OLTA), as *amicus curiae*, filed a brief in support of BRCP. OLTA argues that we should apply the reasoning of *Willamette Col. & Credit Serv. v. Gray*, 157 Or 77, 70 P2d 39 (1937), to this case. The court in *Willamette Col. & Credit* held that, "where a release or satisfaction of a mortgage has been entered by the record owner, a subsequent purchaser, for value and without notice, will be protected against the lien of a prior unrecorded assignment of the mortgages." *Id.* at 85. *Willamette Col. & Credit* has no application here for the reason that the competing interest at issue in that case was *unrecorded*. Here, plaintiff's interest was timely recorded in the project's chain of title.

[16] That provision states:

"The Owner warrants that it has not and will not execute any other Declaration with provisions contradictory to, or in opposition to, the provisions hereof, and that in any event, the requirements of this Declaration are paramount and controlling as to the rights and obligations herein set forth and supersede any other requirements in conflict herewith."

applicable rules, regulations, policies, procedures, rulings or other official statements pertaining to the [LIHTC program]." Again, that contention is unavailing. Even assuming that the release agreement could somehow be deemed a mere "amendment" to the declaration, its content does not "comply" with the Internal Revenue Code or other applicable law. Rather, abrogation of the enforcement rights conferred on plaintiff is inconsistent with the proper application of IRC section 42 and applicable regulations and authoritative pronouncements pertaining to the LIHTC program.[17]

Defendants concede that there is no express authority under federal law to extinguish the enforcement rights conferred on qualified tenants for noncompliance with LIHTC program requirements during the extended-use period.[18] They each argue, however, that doing so is consistent with the letter and spirit of the LIHTC program. We disagree.

---

[17] Defendants rely on an IRS publication entitled Guide for Completing Form 8823 Low-Income Housing Credit Agencies Report of Noncompliance or Building Disposition (the guide), which provides, in part, that, "when a building or project is removed from the program, state agencies have discretionary authority to release the extended use agreement and remove the deed restriction." There are at least two problems with BRCP's reliance on the guide. First, the guide states on its cover that "[u]nder no circumstances should the contents [of this guide] be used or cited as authority for setting or sustaining a technical position." Second, the guide is dated January 2007, and the release agreement here was executed in 2005. Because it post-dates the agency action at issue in this case, it could not have served as authority for the Department's decision.

[18] Nor do defendants argue that abrogation of plaintiff's enforcement rights is authorized under state law. In fact, it appears that such action is contrary to the Department's own regulations. OAR 813-090-0029 provides, in part:

"(2) An executed Reservation and Extended Use Agreement shall be enforceable in any State court by any individual who qualified for occupancy by virtue of the income limitation set for such buildings; shall be binding on all successors of the Applicant; and the Declaration of Land Use Restrictive Covenants incorporated within the Reservation and Extended Use Agreement shall be recorded pursuant to State law as a restrictive covenant."

OAR 813-090-0070 provides, in part:

"(5) The Declaration of Land Use Restrictive Covenants shall be deemed a contract enforceable by one or more tenants as third-party beneficiaries of the Declaration of Land Use Restrictive Covenants and Reservation and Extended Use Agreement.

"(6) In the event the Project owner fails to satisfy the requirements of the Declaration of Land Use Restrictive Covenants and Reservation and Extended Use Agreement and legal costs are incurred by the Department or one or more tenants or beneficiaries, such legal costs, including legal charges and court

The private enforcement rights conferred on qualified low-income tenants are an integral part of Congress's comprehensive design. As already noted, the LIHTC program is front-loaded. *See* 246 Or App at 212-13. A project owner typically receives tax credits during the first 10 years of a project's life. Moreover, although a portion of the tax credits allocated to a project may be recaptured by the IRS in the event of noncompliance with program requirements, the recapture period corresponds to the 15-year compliance period, not the additional 15-year extended-use period. *See* IRC § 42(j). Congress anticipated that the enforcement role played by the pertinent government agencies gradually would diminish and effectively end before expiration of the 30-year extended-use period.

To effectuate continued enforcement, Congress conferred on qualified tenants enforcement rights for the duration of the 30-year extended-use period. IRC § 42(h)(6)(B)(ii). The private enforcement mechanism included in the tax code and restated in the declaration ensures full performance of the promises made by a recipient taxpayer after the tax credits are fully allocated and the recapture period has passed.

As noted, *see* 246 Or App at 220 n 11, Congress explicitly described two situations in which the extended-use period terminates before the end of the 30-year extended-use period. One of those triggering events is an acquisition of the project by foreclosure or instrument in lieu of foreclosure, "unless the Secretary determines that such acquisition is part of an arrangement with the taxpayer a purpose of which is to terminate" the extended-use period. IRC § 42(h)(6)(E)(i)(I). We agree with *amicus* National Housing Law Project (NHLP) that,

> "in specifically prohibiting purposeful foreclosure from terminating an extended use period, Congress clearly articulated its intent to ensure compliance with long-term use requirements. Congress certainly did not intend to prohibit purposeful foreclosure while simultaneously allowing noncompliance with program requirements—which is also

---

costs (including costs of an appeal), are the responsibility of and may be recovered from the project owner."

wholly within an owner's control—to produce the identical result."

We also agree with plaintiff and NHLP that, if failure to comply with program requirements were grounds for early release from the applicable use restrictions, it would create a perverse incentive to encourage noncompliance. An owner of a property subsidized with public funds would be encouraged to violate program requirements in order to secure early release from the LIHTC program. Once released from the obligation to maintain the property as low-income housing for the stated period, an owner would be free to charge market-rate rent or to sell the project for a profit, thereby profiting from a public subsidy without fulfilling the conditions of that subsidy.

In sum, permitting abrogation of LIHTC program-prescribed use restrictions—and, specifically, tenants' rights to enforce those restrictions—by way of "releases" between project owners and local housing agencies would subvert, and even invert, Congressional intent. Plaintiff is, thus, entitled to enforce the declaration's use restrictions, and the trial court erred in concluding otherwise.

Reversed and remanded.